UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EVERYTOWN FOR GUN SAFETY SUPPORT
FUND, THE CITY OF KANSAS CITY,
MISSOURI and THE STATE OF ILLINOIS,

Plaintiffs,

-against-

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES; and REGINA
LOMBARDO, in her official capacity as ACTING
DIRECTOR of Bureau of Alcohol, Tobacco,
Firearms and Explosives,

Defendants.

---

Civil Action No: 21-cv-00376

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Everytown for Gun Safety Support Fund ("Everytown"), the City of Kansas City, Missouri, and the State of Illinois (collectively, "Plaintiffs") submit this Complaint for Declaratory and Injunctive Relief to set aside as unlawful the federal firearms license ("FFL") granted to JA Industries LLC ("JA Industries") by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and Regina Lombardo, in her official capacity as Acting Director of ATF (collectively, "Defendants"). Plaintiffs allege as follows:

## **INTRODUCTION**

1.   This is a lawsuit brought by Plaintiffs against ATF and its Acting Director in her official capacity, challenging ATF's arbitrary, capricious and unlawful decision to issue an FFL to JA Industries, a firearms manufacturer owned and operated by Paul Jimenez ("Jimenez") in Henderson, Nevada, despite JA Industries' ineligibility to receive such a license.

2.      Publicly available court documents and ATF's own records show that, over the past decade and a half, Jimenez, operating through a manufacturing business called "Jimenez Arms," willfully and repeatedly violated the Gun Control Act.  These violations included repeatedly and illegally mailing handguns over state lines to an unlicensed individual who was trafficking guns, permitting a prohibited individual to exercise control over his company through numerous oral agreements (and misrepresenting this fact to ATF) and committing numerous violations of ATF's recordkeeping requirements.

3.      In 2020, facing multiple lawsuits and over $1.3 million in unpaid taxes, Jimenez Arms declared bankruptcy.  Within weeks, Paul Jimenez applied for a new FFL so he could re-start his gun manufacturing business under a new name, JA Industries.  The license was granted by ATF in just 28 business days.

4.      The Gun Control Act and its implementing regulations, however, require ATF to deny a license to an applicant who, among other things, (1) has willfully violated the Gun Control Act or its implementing regulations or (2) has "willfully failed to disclose any material information required[,]" "made any false statement as to any material information required" or "made any false statement as to any material fact" in connection with the application.  *See* 18 U.S.C. § 923(d)(1)(C), (D).

5.      Given the clear and overwhelming evidence of a pattern of lawless behavior and repeated violations of the Gun Control Act by Jimenez and Jimenez Arms, ATF's decision to grant Jimenez a new FFL for JA Industries and ATF's failure to properly investigate were unlawful, arbitrary and capricious.  ATF's decision has allowed Jimenez

to continue manufacturing and distributing firearms, which presents a clear and present danger to public safety.

6.      Every year for over a decade, Jimenez's firearms manufacturing operations have churned out tens of thousands of cheap, low-quality handguns.[1]  These pistols are deadly weapons that are priced to be disposable, routinely retailing for less than $150.

7.      Firearms originating from Jimenez's operation in Henderson have been used at and retrieved from crime scenes throughout the United States in cities like Kansas City, Missouri, and Chicago, Illinois, at a rate disproportionate to the company's market share.  This result is unsurprising.  Cheap, poorly made pistols like these are particularly attractive to criminals who may need to replace or discard them at a moment's notice.  This also makes them more profitable for traffickers—individuals who are unlicensed to sell firearms to third parties and do so illegally.

8.      Jimenez was the founder and president of Jimenez Arms and its sole listed "responsible person," a designation that ATF defines as "any individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of the [company], insofar as they pertain to firearms."[2]  But Jimenez did not operate Jimenez Arms alone.  Every step of the way, Jimenez Arms accepted and relied on financial assistance and operational guidance from a disgraced firearms dealer named Bruce Jennings ("Jennings") and his associates.  Jennings has been convicted of numerous crimes, including domestic violence and distribution of child pornography, for which he is

---

[1]  Data & Statistics, Annual Firearms Manufacturers & Export Report, ATF, https://www.atf.gov/resource-center/data-statistics.
[2]  ATF Form 7, Responsible Person Questionnaire (revised Oct. 2020), available at https://www.atf.gov/file/117486/download; *see also* 18 U.S.C. 923(d)(1)(B).

currently serving a sentence in federal prison. As a result, he is prohibited by law from possessing a firearm or shipping or transporting firearms in interstate commerce. Indeed, for these reasons, ATF denied an FFL for a prior company in which Jennings was a "responsible person."

9.      Jennings has been intimately involved with Jimenez's handgun manufacturing business since Jimenez Arms' formation. Indeed, Jimenez obtained its manufacturing equipment—and recruited employees—out of the bankruptcy of Jennings' defunct firearms manufacturing operation, Bryco Arms; he funded this acquisition using a $430,000 wire transfer from Jennings' ex-wife, Janice Jennings. Over the following years, Jennings and his family continued to provide significant financial support to Jimenez. Jennings has also at times exerted operational control over Jimenez's business.

10.     Despite Jennings close involvement with Jimenez Arms, Jimenez repeatedly represented to ATF during licensing proceedings from 2003 to 2005 that he was the company's sole responsible person. These false and misleading statements were clear and willful violations of the Gun Control Act, which should have disqualified Jimenez from being re-licensed by ATF in 2020 under a new business name.

11.     Through Jimenez Arms, Jimenez committed other violations of the Gun Control Act that also should have disqualified him from receiving an FFL from ATF for JA Industries. Jimenez Arms did business for years with Kansas City firearms trafficker James Samuels, who has since pled guilty to violating a host of federal gun laws. Among other violations of the firearms laws, Jimenez Arms shipped guns directly to Samuels' home, even though it was clear that doing so was facilitating Samuels' violation of federal gun laws and regulations.

12.     For decades, Defendants have been monitoring Jimenez and his associates and Defendants have, on multiple occasions, taken formal enforcement action against Jimenez Arms for its misconduct.  During two routine inspections in 2012 and 2017, ATF cited Jimenez Arms with serious recordkeeping violations of a type that undermine the purpose of the Gun Control Act, which is to prevent gun trafficking and other gun crimes.

13.     In an effort to avoid accountability for its illegal actions and erase its debts, Jimenez Arms declared Chapter 7 bankruptcy in January 2020 with over $1.3 million in unpaid federal taxes and numerous additional outstanding liabilities. Jimenez, however, was undeterred, and took immediate steps to continue his firearms business, including applying for a new license only weeks after Jimenez Arms filed for bankruptcy.  He now calls the operation "JA Industries," but the equipment, staff, management and inferior product are the same.

14.     Due both to his false assertions that Jennings and his family did not play a role in directing the operations of Jimenez Arms, and his unlawful shipment of guns to at least one illegal trafficker, Jimenez was disqualified from holding an FFL.  But rather than follow the law and put an end to Jimenez's illicit and dangerous career in the firearms industry, Defendants failed to conduct a reasonable investigation and granted Jimenez another license when it approved JA Industries' request for an FFL.

15.     Defendants' decision to grant Jimenez an FFL under these circumstances was unlawful, arbitrary and capricious and must be set aside.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this case arises under the Administrative Procedure Act ("APA").  This Court has remedial authority under the APA.  5 U.S.C. § 706.

17.     Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(e) because Plaintiff Everytown for Gun Safety Support Fund ("Everytown") has its principal place of business in this District.

## PARTIES

18.     Plaintiff Kansas City, Missouri ("Kansas City") is Missouri's largest city, with a population of approximately 495,000.

19.     The residents and citizens of Kansas City suffer greatly from gun violence.  Kansas City has one of the highest rates of gun violence deaths and injuries among cities in the United States.  From June 2018 to May 2019, Kansas City had a rate of over 29 murders per 100,000 people—a higher murder rate than that for cities such as Chicago and Washington, D.C.  And in both 2019 and 2020, over 90% of all homicides in Kansas City were committed with firearms.

20.     The trafficking of cheap handguns, like those manufactured by Jimenez, into Kansas City and its surrounding areas has contributed to this gun violence crisis.

21.     Kansas City has regularly—and disproportionately—recovered Jimenez Arms guns at crime scenes.  Over a five-year period from 2014 to 2018, the Kansas City Police Department recovered, seized or held as evidence at least 166 Jimenez Arms guns.

6

22.     The prevalence of Jimenez Arms guns in Kansas City area gun trafficking is exemplified by James Samuels' gun trafficking operation.  Of the 77 firearms that Samuels is known to have trafficked between 2013 and 2018, 57 of them were Jimenez Arms pistols.  In an affidavit filed in connection with Samuels' federal prosecution, an ATF investigator noted that the company's role came as no surprise, as its firearms were "frequently used by criminals."  In addition to state crimes, federal prosecutors in the Western District of Missouri have brought cases against individuals who have used Jimenez Arms guns to carry out carjackings, high-speed car chases, drug trafficking and bank robberies (among numerous other crimes).

23.     Plaintiff the State of Illinois (the "State") is a sovereign state of the United States of America.  As a body politic and sovereign entity, the State of Illinois brings this action to redress harms to its sovereign authority, quasi-sovereign authority, proprietary interests, and as trustee, guardian and representative of all residents and citizens of Illinois as *parens patriae*.

24.     The State "has an important and compelling interest in its citizens' safety" and in "protecting the public from firearms violence."  *Horsley v. Trame*, 808 F.3d 1126, 1132 (7th Cir. 2015).  The State has enacted a robust statutory scheme regulating the possession, acquisition, sale and manufacture of firearms.  *See* 430 ILCS 65/0.01 *et seq.*; 720 ILCS 5/24-1, 24-3.

25.     Since 1973, Illinois law has prohibited any federally licensed "dealer, importer, manufacturer or pawnbroker" from manufacturing, selling or delivering to "any unlicensed person a handgun having a barrel, slide, frame or receiver which is a die casting of zinc alloy or any other nonhomogeneous metal which will melt or deform at

a temperature of less than 800 degrees Fahrenheit." 720 ILCS 5/24-3(A)(h); 1973 Ill. Laws 1129-31, § 1 (enacted Aug. 21, 1973). This "melting point" law was intended to reduce the incidence of gun violence by removing the cheapest types of handguns from the market. To comply with this law, firearms dealers in Illinois inform customers that they are unable to sell Jimenez Arms handguns.

26. As a result of the melting point law, many firearms distributors have policies against shipping certain makes and models of handguns—including all models of Jimenez Arms pistols—into Illinois.

27. Despite the State's prohibitions on the sale of these handguns, law enforcement agencies throughout Illinois recover Jimenez Arms pistols in connection with criminal activity. For example, based on Jimenez Arms' market share, the Chicago Police Department has recovered Jimenez Arms pistols at a disproportionately higher rate, compared to other makes of pistols, with 378 pistols recovered in a five-year period from 2014 to 2018. Jimenez Arms pistols have been recovered by law enforcement agencies investigating criminal activity all over Illinois, from Skokie to Decatur to East St. Louis, in recent years.

28. Law enforcement agencies in the State of Illinois also have recovered or documented use of Jimenez Arms pistols in connection with interstate trafficking impacting the State. For example, in March 2019, officers with the Chicago Police Department recovered an illegally possessed Jimenez Arms pistol from two men in a speeding vehicle; the pistol had been purchased two days earlier at a Gary, Indiana, gun dealer by a woman who was later convicted of federal charges in connection with the

purchase.[3]  Similarly, a gun trafficker purchased 26 firearms, including two Jimenez Arms pistols, from Indiana dealers between January 2019 and August 2020; the trafficker represented he had purchased all but one of the firearms for individuals residing in Chicago.[4]

29.     In 2019, law enforcement agencies in the State recovered firearms originating from out-of-state retail sales at an exceptionally high rate; only four states in the country had higher rates of recovery for firearms sourced from outside its respective borders.[5]  Law enforcement traced sales of over half of the firearms recovered in Illinois in 2019 to sources originating outside the state.

30.     Defendants' issuance of a license to Jimenez for JA Industries undermines the State of Illinois' ability to enforce its firearms laws and regulations within its borders.  By licensing JA Industries, a foreseeable source of highly-trafficked firearms, the State can reasonably anticipate law enforcement will continue to recover dangerous, disposable handguns in connection with crimes in Illinois at a disproportionate rate compared with other makes of firearms.

31.     Further, access to cheap firearms, secured readily through secondary sources due to the demonstrated lack of sufficient oversight and tracking by Jimenez's businesses, continues to threaten the lives and safety of all Illinoisans.  Gun violence in the State takes Illinois residents' lives and livelihoods and damages communities across the State.  On average, 1,363 people die by guns in the State each year, including 805 gun

---

[3]  Government's Sentencing Memorandum, *U.S. v. Bean*, 20-CR-00019 (N.D. Ind. Nov. 13, 2020).
[4]  Criminal Complaint, *U.S. v. Ivery*, 20-MJ-00143, 3-4 (N.D. Ind. Aug. 26, 2020).
[5]  The four states with higher rates of recovery were Connecticut, Maryland, New Jersey and New York. Data derived from ATF's 2019 firearms trace data.  *See* ATF, Firearms Trace Data–2019, https://www.atf.gov/resource-center/firearms-trace-data-2019.

homicides.[6]  The State's gun homicide rate is the ninth highest in the country, at 6.4 deaths

per 100,000 people.[7]  Communities of color disproportionately experience the effects of

gun violence, with the gun death rate among Black Illinoisans ranking as the third highest

in the country.  Further, the rate of gun homicide in Illinois increased 29% from 2009 to

2018.[8]

        32.     The State of Illinois incurs substantial costs from gun violence.

Congressional staff has estimated that the annual cost to the State is $7.2 billion each year.[9]

The State spends billions of dollars annually on health care benefits and services for Illinois

residents enrolled in Medicaid, a public insurance program for low-income families and

individuals that is jointly funded by the State and the Federal government.  Persons injured

by gun violence incur medical costs that the State pays for through its Department of

Healthcare and Family Services in combination with Medicaid.  The State must also spend

time, money and resources to prevent gun violence.  For fiscal year 2020, the budget for

the State of Illinois included more than $42 million for violence reduction and intervention

strategies.[10]

        33.     There are also indirect costs to the State, like property devaluation,

deterrence to tourism, trauma centers, long-term mental health effects and population loss,

---

[6]  Everytown for Gun Safety, EverStat–Landscape of Gun Violence,
https://maps.everytownresearch.org/everystat#Illinois (last visited Jan. 8, 2021).

[7]  *Id.*

[8]  *Id.*

[9]  U.S. Congress Joint Economic Committee Democratic Staff, *A State-by-State Examination of the Economic Costs of Gun Violence* (Sept. 18, 2019),
https://www.jec.senate.gov/public/_cache/files/b2ee3158-aff4-4563-8c3b-0183ba4a8135/economic-costs-of-gun-violence.pdf.

[10]  Giffords Law Center to Prevent Gun Violence, Investing in Local Intervention Strategies in Illinois,
https://giffords.org/lawcenter/state-laws/investing-in-local-intervention-strategies-in-illinois/ (last updated Oct. 19, 2020).

many of which are disproportionately borne by diverse communities.[11]  In issuing a license to JA Industries, Defendants license criminals' continued access to a source of highly-trafficked firearms, firearms that state law enforcement officials disproportionately recover in connection with crimes and that will contribute to the costs incurred by the State of Illinois from gun violence.

34.     The Gun Control Act—and ATF's unlawful issuance of a firearms license in particular—implicates the interests of Plaintiffs Kansas City and the State of Illinois because that law was enacted with the express purpose of "provid[ing] support to Federal, State, and local law enforcement officials in their fight against crime and violence . . . ." Pub. L. No. 90-618, § 101.

35.     The State and Kansas City have a strong interest in ensuring that ATF follows the procedure outlined in the Gun Control Act for issuing FFLs to gun manufacturers who distribute guns in its markets.

36.     The State and Kansas City have a strong interest in ensuring that firearms do not end up in the hands of individuals who are likely to use them to commit crimes or who are already prohibited by law from owning or possessing them, including felons and domestic violence offenders.  ATF's decision to grant an FFL to Jimenez for JA Industries, as described herein, interferes with and undermines this interest.

37.     The State and Kansas City have a strong interest in preventing and reducing shootings, other gun crimes and gun trafficking in their jurisdictions.  ATF's decision to grant an FFL to Jimenez for JA Industries and, in turn, to allow Jimenez, through JA Industries, to continue to sell inexpensive and highly-trafficked firearms into

---

[11] "Black men make up 7% of Illinois's overall population, but 72% of gun homicide victims."  *Id.*

11

the State of Illinois' and Kansas City's markets, as described herein, interferes with and undermines this interest.

38.    The State and Kansas City suffer economic injury from—and expend substantial sums of money to combat—gun crime, including gun trafficking, murders, shootings and other firearm-related crimes.

39.    The State and Kansas City expend substantial sums of money on police and other emergency services associated with gun-related crime.  The State and Kansas City suffered and will suffer economic injury, and have spent and will continue to spend significant amounts of money, because of criminal activity carried out with and connected to guns manufactured by Jimenez, including increased costs for law enforcement and investigations, emergency medical services, cleanup of crime scenes and crime-victims and other social services.

40.    Defendants knew or reasonably should have known that by issuing yet another FFL to Jimenez (this time for JA Industries)—an individual with a long history of violating the firearms laws and regulations, as described herein—they would be contributing to increases in the number of guns in the hands of prohibited persons and increases in gun violence and gun-related crimes, including in the State of Illinois and Kansas City.

41.    Revoking or invalidating JA Industries' FFL would result in the reduction of the number of firearms that end up in the hands of prohibited persons, including those who use them to commit crimes, in the State of Illinois and Kansas City, and the prevention and reduction of future gun violence in the State of Illinois and Kansas

City, including reducing the associated economic harm to and expenditures of funds of the State and Kansas City as described above.

42.     Plaintiff Everytown engages in education, research and litigation to address gun violence. Everytown seeks to improve public understanding of the causes of gun violence and help reduce it by conducting groundbreaking original research, communicating this knowledge to the American public, developing evidence-based policies and advancing gun safety and gun violence prevention in communities and the courts.

43.     Everytown and its supporters develop, advocate for and provide education about numerous policies that would keep guns out of the hands of persons with dangerous histories.

44.     Everytown and its supporters advocate for, provide financial support to and educate about community-based gun violence intervention programs in cities and states significantly affected by gun violence.

45.     Everytown has taken extraordinary steps to prevent the infliction of further harm by Jimenez and his businesses, and, absent relief in this case, will continue to divert significant resources to those efforts.

46.     Everytown represents survivors of gun violence perpetrated with a Jimenez Arms firearm and the City of Kanas City in two lawsuits against Jimenez Arms alleging the company's involvement in firearms trafficking.

47.     In July 2020, after learning of ATF's decision to grant yet another license to Jimenez, Everytown sent a letter to the Special Agent in Charge of the San Francisco Field Division (which has jurisdiction over JA Industries), describing in detail

the reasons ATF's decision to grant an FFL to JA Industries was not only illegal but posed a danger to the public.  In its letter, Everytown asked, "[h]ow many more times will Mr. Jimenez need to break the law and make a mockery of the federal licensing process before the ATF finally acts to protect the public?"  The letter went unanswered.

48.     After Jimenez Arms declared bankruptcy, Everytown purchased the entire existing inventory of Jimenez Arms' pistols and pistol frames that were part of the debtor's estate, to prevent Jimenez from purchasing it himself to use in beginning a new pistol manufacturing business.  The cost to Everytown was $12,571.  This is the first and only time Everytown has purchased a manufacturer's firearms inventory, which is not a part of Everytown's regular course of operations.

49.     In furtherance of its mission to prevent gun violence, Everytown also entered into an agreement with a non-profit federal firearms licensee to take possession of and destroy the Jimenez Arms firearms inventory that Everytown had purchased, the first time Everytown had ever engaged in that type of activity.  This cost Everytown an additional $6,850.

50.     Defendants' actions have undermined, and will continue to undermine, the advocacy and education work carried out by Everytown and its supporters. ATF's decision to grant an FFL to Jimenez for JA Industries foreseeably will allow the renewed proliferation of dangerous, heavily trafficked firearms, precisely the result that Everytown has worked and continues to work to prevent.

51.     Defendants' actions have compelled Everytown to divert resources from its traditional core public advocacy, education and litigation programs to address the proliferation of dangerous guns by Jimenez.  In addition to the diversion of resources

14

outlined above, Everytown has had to devote significant staff resources to monitoring Jimenez's actions and output of heavily trafficked weapons, including by assigning a specialized investigator to work on these issues, thereby diverting the investigator from other assignments she otherwise would have been able to undertake for Everytown.

52.     Defendant ATF is a component of the United States Department of Justice.  ATF's mission is to "protect[] our communities from violent criminals, criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, acts of terrorism, and the illegal diversion of alcohol and tobacco products."  ATF is responsible for evaluating FFL applications and denying or granting them based on the applicable law.

53.     Defendant Regina Lombardo is the Acting Director of ATF.  She is sued in her official capacity.

## STATUTORY FRAMEWORK

54.     Under the Gun Control Act, ATF can issue a federal firearms license only to a "qualified applicant."  18 U.S.C. § 923(c).  A "qualified applicant" is one who meets the licensing criteria of 18 U.S.C. § 923(d), *i.e.*, an applicant must:  be 21 or older; have a business premises; certify that the business can operate in compliance with state and local laws; and certify secure gun storage or safety devices will be available at any place the applicant sells firearms.  18 U.S.C. § 923(d)(1)(A), (E)-(G).  The applicant must *not*: be prohibited from transporting, shipping or receiving firearms or ammunition; have "willfully violated any of the provisions" of the Gun Control Act or its implementing regulations; or have "willfully failed to disclose any material information required," or

"made any false statement as to any material fact, in connection with his application."  18 U.S.C. § 923(d)(1)(B), (C), (D).

55.     At the time the Gun Control Act was under consideration, Congress envisioned that it "would prescribe meaningful licensing standards and denial hearing procedures designed to assure that licenses would be issued only to responsible, law-abiding persons actually engaged in, or intending to engage in, business as importers, manufacturers, or dealers in firearms or ammunition."  S. Rep. No. 90-1501, at 25 (Sept. 6, 1968).  The provisions "set forth specific standards . . . to obtain Federal licenses" because the prior "absence of specific standards from the Federal law . . . have resulted in abuse which violates the intent of present Federal firearms controls."  *Id.*

56.     Congress emphasized that "[t]he standards for issuing a license would be greatly strengthened," H.R. Rep. No. 90-1577, at 16 (1968), in its revision of a licensing provision established in the Omnibus Crime Control and Safe Streets Act passed earlier in 1968, a provision that in no uncertain terms provided that a licensing application "shall be disapproved and the license denied," Pub. L. No. 90-351, 82 Stat. 197, 232 (1968), if the applicant did not meet the listed licensing criteria.

57.     The broader purposes of the Gun Control Act confirm that in revising the licensing standards in the Omnibus Crime Control and Safe Streets Act, Congress intended the licensing criteria to be meaningful, exacting, and helpful to states and localities in enforcing their own firearms laws.  The big-picture objective of the new law was to "make it possible to keep firearms out of the hands of those not legally entitled to possess them," an objective undermined at the time by the "ready availability, that is, the ease with which any person can anonymously acquire firearms."  S. Rep. No. 90-1501,

16

at 22 (June 21, 1968).  Under then-existing federal firearms laws, the market in unregulated mail-order firearms was "characterized by ready availability, minimal cost and anonymity of purchase" which resulted in "an ever-increasing abuse of this source of firearms by juveniles, minors, and adult criminals." *Id.*  States were poorly positioned to address these problems on their own because of the differences in laws between states.  *Id.*  Congress chose robust regulation of firearms businesses as a solution:  "Only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business of importing, manufacturing, or dealing in firearms, can this problem be dealt with, and effective State and local regulation of the firearms traffic be made possible."  *Id.*

## **FACTUAL ALLEGATIONS**

58.    ATF's decision to grant an FFL for JA Industries despite Jimenez's prior disqualifying misrepresentations to ATF and Jimenez Arms' other violations of the federal firearms laws was arbitrary, capricious and contrary to law.  When seeking a license for Jimenez Arms, Jimenez falsely represented to ATF that he was that business' sole controlling person, when in fact he operated it with the assistance and financial backing of Bruce Jennings, who was disqualified from operating a firearms business, and his family. Jimenez also committed, through Jimenez Arms, additional willful violations of the Gun Control Act, including through repeated record-keeping deficiencies and by shipping handguns directly to the home address of a gun trafficker who Jimenez Arms knew or consciously avoided knowing was illegally selling guns to third parties without a license.

17

### A.    Paul Jimenez's Connections to Bruce Jennings and the Founding of Jimenez Arms

59.    Between 1990 and 2003, Jimenez worked as a shop foreman at Bryco Arms ("Bryco"), a firearms manufacturing company based in Costa Mesa, California.

60.    Bryco was founded by Jennings, whose family has been involved in as many as a dozen firearms businesses over the last 50 years.  According to one news report, several of the companies that Jennings, his family members and associates have operated closed in the face of "criminal accusations, federal investigation, or lawsuits alleging the handguns their factories produced were prone to spontaneously discharge, explode, or be used in crime."[12]

61.    At the time Jimenez worked at Bryco, it was owned by Janice Jennings, Jennings' ex-wife.  Jennings has admitted to ATF that, in fact, he controlled Bryco, as reflected in ATF's own summary documents.

62.    Bryco distributed its firearms through B.L. Jennings, a company Jennings owned.  In March 2003, ATF denied an application from B.L. Jennings to renew, and revoked its FFL because Jennings, as a responsible person for the company:  (a) was prohibited from possessing and selling firearms after he pled down an initial felony domestic violence charge to a misdemeanor and (b) falsely omitted this misdemeanor conviction on a renewal application.[13]

---

[12] Brian Freskos, *A Shady Gun Company Cheated Death and Cashed In*, Daily Beast (Aug. 12, 2020), https://www.thedailybeast.com/a-shady-gun-company-cheated-death-and-cashed-in.

[13] *Jennings v. Mukasey*, 511 F.3d 894, 896-97 (9th Cir. 2007); *see also* Freskos, *A Shady Gun Company Cheated Death and Cashed In*.

63.     In May 2003, Bryco filed for Chapter 11 bankruptcy.  ATF records state that lawsuits regarding the flawed design of Bryco's firearms "not only have caused Bryco to file bankruptcy, but actually caused Bruce Jennings to admit that he controlled Bryco."

64.     In particular, a primary impetus for Bryco's bankruptcy filing was a $24 million civil judgment against Bryco, B.L. Jennings and Jennings, arising out of an accidental shooting caused by a defectively designed Bryco pistol that rendered Brandon Maxfield, a seven-year-old boy, quadriplegic.

65.     In an attempt to prevent others from using Bryco's equipment to manufacture similarly dangerous firearms, Maxfield and his attorney raised over half a million dollars to buy the company's assets out of bankruptcy.

66.     Outbidding Maxfield by $5,000, Jimenez purchased Bryco's machinery and inventory of 76,000 unassembled gun frames in a bankruptcy auction for $510,000.[14]

67.     In or around September 2003, Jimenez applied for an FFL for Jimenez Arms, a firearms manufacturing company based at Bryco's address in Costa Mesa, California.  In this application, Jimenez represented that he was the sole "responsible person" for Jimenez Arms.

68.     During an interview on or about January 15, 2004, Jimenez, whose annual salary at Bryco was reportedly $30,000, told ATF that his sole source of funds for Jimenez Arms was personal savings and that he was supported by no additional investors. When ATF officials asked him directly, "Will Bruce Jennings or any other member of the

---

[14] Fox Butterfield, *Fraud Alleged in Winning Bid for Gun Manufacturer,* N.Y. Times (Oct 22, 2004), https://www.nytimes.com/2004/10/22/us/fraud-alleged-in-winning-bid-for-gun-manufacturer.html.

Jennings family have any role in the company or the licensed premises?", Jimenez answered "No."

69.     During a second interview with ATF on or about February 24, 2004, Jimenez changed his story and admitted that he would pay for Bryco's assets with "[p]ersonal loans from family and friends."

70.     Those "family and friends" were, in fact, members of the Jennings family, directly contradicting Jimenez's representation to ATF.

71.     Indeed, on the same day Jimenez beat out Maxfield to purchase Bryco's assets—and before he acknowledged to ATF that he was financing the purchase with outside funds—he received a wire transfer of $430,000 from Shining Star Investments, LLC ("Shining Star"), a gun distributor owned by Janice Jennings, the same person ATF had already concluded was letting Bruce Jennings run Bryco Arms.[15]

72.     On or about February 26, 2004, ATF conducted an Application Inspection of Shining Star.

73.     After questioning Janice Jennings about Bruce Jennings' involvement in Shining Star, ATF concluded that "[t]here was some suspicion of hidden ownership," calling into question Jimenez's representation to ATF that Bruce Jennings and other Jennings family members had no role in the newly-established Jimenez Arms.

74.     Nor was the evidence from Shining Star the only indication of Bruce Jennings' involvement in Jimenez Arms.  During a June 2004 interview in connection with Jimenez's application for an FFL for Jimenez Arms, Jennings accompanied Jimenez and

---

[15] Butterfield, *Fraud Alleged in Winning Bid for Gun Manufacturer*.

threatened to sue ATF over Jennings' perception that it was delaying approval of Jimenez's FFL application, thereby "costing him $1,000 a day for Bryco."

75. On or about July 9, 2004, ATF approved an FFL for Jimenez Arms.

76. ATF approved the FFL for Jimenez Arms even though it was readily apparent that Bruce Jennings was involved in the company and that Paul Jimenez had lied to ATF about that fact in violation of the Gun Control Act.

77. An ATF document prepared contemporaneously with the approval of Jimenez Arms' FFL states that "[i]t is . . . believed that Paul Jimenez is working for Bruce Jennings . . . ."

78. After the California Attorney General's Office ordered the company to stop manufacturing in California for violating state safety and performance standards, Jimenez moved the company's incorporation to Nevada, and Jimenez Arms submitted a new application for an FFL to operate there.

79. In connection with his FFL application to ATF, Jimenez again listed himself as the sole responsible person for Jimenez Arms and stated that he was the sole shareholder. Based on these representations, in part, ATF recommended the application for approval in July 2006, even though ATF's own documents show that it believed that Jimenez was working for Bruce Jennings, a prohibited individual, and that Jimenez had previously misrepresented this fact to ATF in connection with Jimenez Arms' prior licensing application.

80. In fact, Jennings and his family remained inextricably involved in Jimenez Arms. According to court filings submitted by Jimenez in other actions, between

2006 and 2007, Jennings and his mother Lottie Jennings invested in Jimenez Arms via personal loans.

81.     In 2007, Jimenez also entered into an oral agreement with Jennings, under which trusts in the names of Jennings' children, Kimberly and Bradley, purchased two-thirds of Jimenez Arms, with the understanding that the company would make distributions if it became profitable.

82.     After Jimenez submitted a letter of change in stock control, ATF was aware that Jimenez Arms was, at that point, controlled by members of the Jennings family.

83.     In a complaint Jennings filed against ATF, Jennings represented that he joined Jimenez Arms in 2008 as an "independent contractor/consultant" to "assist Jimenez Arms in evaluating its products performance and design."

84.     ATF filings in the same litigation state that the agency warned Jimenez Arms in a 2008 letter that the company faced "potential prosecution" for providing firearms to, and aiding and abetting the possession of firearms by, Jennings.

85.     Despite numerous indications of Jennings' personal involvement and control, in or around April 2009, ATF stated in a report that it did not suspect hidden ownership of Jimenez Arms.

86.     In 2013, Jennings, already ineligible to possess and sell firearms due to his domestic violence conviction, was also convicted of felony possession and distribution of child pornography, an independent basis for ineligibility under 18 U.S.C. § 922(g).[16]

---

[16] Press Release, *Owner of B.L. Jennings and Bryco Firearms Sentenced to More than 10 Years on Federal Pornography Charges*, Dep't of Justice, U.S. Attorney's Office – Middle District of Florida (May 30,

87.     In litigation brought by Jimenez in 2016, he alleged that in 2013, Jimenez Arms paid $1 million for the "equipment, inventory, and general intangibles, including, but not limited to, customer and distributor lists" of Florida firearms company JoJen, Inc. ("JoJen").  JoJen was nominally owned by Joanne Jennings, Jennings' then-wife.  Jimenez admitted in the 2016 litigation that he knew that JoJen "was affiliated with Bruce Jennings."

88.     In the same filing, Jimenez also claimed that in 2014, Bradley Jennings "demanded most of Jimenez Arms, Inc.'s products and inventory" for the "sole benefit" of Shining Star Investments—the distributor owned by Janice Jennings.

### B.     Connection to Firearms Traffickers

89.     Jimenez specializes in cheap, low quality pistols made from a zinc alloy with a low melting temperature.  The pistols sell for about $150 at retail.

90.     Jimenez firearms fall into a category sometimes referred to as "Saturday Night Specials," a label for cheap handguns that are particularly attractive to criminals and juveniles and, as a result, more profitable for traffickers.  ATF officials are aware of this, with one special agent acknowledging in an affidavit that because Jimenez Arms pistols are "commonly inexpensive," profits could be made by "buying them at low cost and selling at marked up price to prohibited individuals."[17]

91.     From about 2013 to about 2015, Jimenez Arms shipped dozens of firearms to James Samuels, a now-convicted gun trafficker in Kansas City.

---

2013), https://www.justice.gov/usao-mdfl/pr/owner-bl-jennings-and-bryco-firearms-sentenced-more-10-years-federal-child-pornography.

[17] Affidavit for Criminal Complaint at ¶ 69, *United States v. Samuels,* No. 18-CR-00309-GAF (W.D. Mo. Oct. 1, 2018).

92.     Despite multiple obvious indications that Samuels was trafficking the guns, Jimenez Arms continued to ship guns to Samuels and never informed ATF or other law enforcement of Samuels' trafficking activity.

93.     Beginning in or around November 2013, Samuels began purchasing firearms from Jimenez Arms and asking that the guns be shipped to Conceal & Carry, a licensed dealer in Kansas City.

94.     Samuels originally told Jimenez Arms employees that he was a firefighter who worked part time with Conceal & Carry.  Over the next two months, Samuels used his personal credit card to purchase at least 16 pistols, which Jimenez Arms shipped to Conceal & Carry.  Samuels turned around and sold these guns to straw purchasers, who sold the guns in an illegal secondary market.  One of these pistols was seized by the Kansas City Police Department when they served an order of protection on a man who had threatened to kill his girlfriend, and another was found, along with stashes of cocaine and marijuana, by police in Chicago executing a search warrant.

95.     In or around December 2014, Jimenez Arms sold eight pistols to Samuels, who again used his personal credit card.  For this order, Jimenez Arms was told that Conceal & Carry had changed its address to 2201 East 38th Street, Kansas City, Missouri.  The new address was, in reality, Samuels' home address.  A month later, in or around January 2015, Jimenez Arms mailed three more pistols to Samuels' home.  Samuels used a different credit card to pay for this order, but this card was also a personal credit card belonging to Samuels.

96.     Samuels did not have an FFL and was not licensed to receive firearms directly from a manufacturer.

97.     Jimenez Arms knew, or consciously avoided knowing, that it was shipping firearms directly to a non-licensed trafficker in violation of federal law.

98.     As a licensed firearms manufacturer, Jimenez Arms knew that a licensee cannot change its address without amending its license.  Jimenez Arms was also aware that ATF maintains an "EZ Check" system, which provides an easy way to verify a dealer's license status and address, having told ATF during a 2014 inspection that it uses EZ Check before shipping firearms to any licensee.  Upon information and belief, Jimenez Arms failed to verify Conceal & Carry's purported new address in this case, in violation of 27 C.F.R. § 478.

99.     In or around April 2015, Samuels told Jimenez Arms he was now ordering through another dealer in the Kansas City area licensed as Blue Steel Guns & Ammo ("Blue Steel").

100.     In 2018, ATF began the investigation of Samuels' gun trafficking that led to his arrest.

101.     Through that investigation, ATF learned that Jimenez Arms was selling guns to Samuels, who was a trafficker.

102.     During the investigation, an employee of Jimenez Arms told ATF that she had called Blue Steel in April 2015 to obtain the new FFL information.  The employee represented that Blue Steel told her that Samuels could have firearms shipped to Blue Steel and that "Samuels already had buyers for the firearms."

103.     The fact that Samuels "already had buyers for the firearms" explicitly indicated to Jimenez Arms that Samuels, who did not have his own FFL, was

reselling the guns to third parties—*i.e.*, engaging in the business of dealing in firearms without a license—in violation of 18 U.S.C. § 923(a).

104.    Despite that knowledge, Jimenez Arms shipped the five firearms Samuels ordered to Blue Steel.

105.    When the Jimenez Arms firearms arrived at Blue Steel, a Blue Steel employee called Jimenez Arms and said that Samuels was not authorized to purchase firearms through Blue Steel.

106.    Subsequently, the Jimenez Arms employee called Samuels to ask for an explanation.  As the employee later told ATF, Samuels explained during the call that he placed orders for firearms, had them shipped to a local dealer and then arranged for his own customers to buy the firearms.  In other words, Jimenez Arms was again explicitly told that Samuels was engaged in the business of dealing in firearms, something only a licensee is permitted to do.

107.    Jimenez Arms stopped doing business with Samuels after this conversation but, upon information and belief, did not report to ATF or other law enforcement Samuels' gun trafficking business, or that it had sold Samuels over 30 firearms during the prior two years.

108.    As of 2018, Samuels had purchased 57 Jimenez Arms guns (32 directly from Jimenez Arms), 43 of which Samuels trafficked to third parties, largely in and around Kansas City.  Upon information and belief, at least six of the Jimenez Arms firearms trafficked through Samuels were used in crimes—several of which were committed in and around Kansas City.  One of the Jimenez Arms guns trafficked by

Samuels tragically was used by a 16-year-old to murder Alvino "Dwight" Crawford on July 5, 2016.

109.    Jimenez was responsible for creating a business culture that disregarded federal gun laws, resulting in Jimenez Arms' dealings with Samuels and the decision not to report him to law enforcement.  The same pattern is likely to repeat with JA Industries, which injures each of the Plaintiffs.

### C.    Jimenez Arms' Recordkeeping Violations

110.    In the course of routine inspections, ATF twice cited Jimenez Arms for recordkeeping violations.  In evaluating Jimenez's application to obtain a license for JA Industries, these repeat failures to abide by ATF regulations should have warranted the denial of the application or at least raised, serious concerns about the nature of Jimenez's business that warranted some investigation.

111.    In an August 2012 inspection report, ATF noted that Jimenez was one of the two people responsible for maintaining acquisition and disposition records and that Jimenez Arms' entries of acquisitions and disposition of firearms were "not verified nor reviewed.  In addition, due to lack of internal audit procedures, the errors on [the] A&D record [we]re never addressed."  ATF also found that firearms at the company were missing or unaccounted for, but that Jimenez Arms did not report the losses to ATF and local law enforcement and had transferred firearms to another licensee without recording the dispositions.  ATF cited Jimenez Arms with four types of recordkeeping violations.

112.    First, ATF cited Jimenez Arms with failure to maintain acquisition and disposition records, in violation of 27 C.F.R. § 478.122(a)(3).

27

113.     Second, ATF cited Jimenez Arms with failure to report the theft or loss of four firearms to ATF and local law enforcement, in violation of 27 C.F.R. § 478.39a.

114.     Third, ATF cited Jimenez Arms with failure to timely record the acquisition of firearms, in violation of 27 C.F.R. § 478.123(a).

115.     Fourth, ATF cited Jimenez Arms with failure to timely record the disposition of firearms, in violation of 27 C.F.R. § 478.123(b).

116.     These regulations are in place to prevent gun trafficking and to allow law enforcement to trace firearms used in crimes.  Violation of these regulations, taken together with Jimenez's history, provided strong evidence to ATF that Jimenez Arms firearms were being trafficked and that Jimenez—as the self-identified "responsible person" for the company—knew it.

117.     Instead of taking more serious action, ATF held a warning conference "in lieu of revocation" of Jimenez Arms' FFL.

118.     In or around March 2014, ATF conducted an inspection of Jimenez Arms' factory.  Based on Jimenez's false representation to the ATF inspector that he did not sell firearms to unlicensed buyers, the inspector concluded that "[n]o trafficking issues were disclosed . . . relating to the acquisition and disposition of firearms[,]" but did note that "the licensee does not have any written internal controls in maintaining accurate records of acquisitions and dispositions."

119.     Following another inspection in or around 2017, ATF cited Jimenez again for failing to timely record the acquisition and disposition of firearms, in violation of 27 C.F.R. §§ 478.123(a) and (b).  These violations again included instances in which

28

Jimenez Arms transferred firearms to another licensee without recording those dispositions and in which firearms "were determined to be missing and [were] not reported."

120.    ATF issued Jimenez Arms a warning letter expressing "particular concern" about the inventory for which the company was unable to account but took no further action against Jimenez Arms.

121.    This history of recordkeeping violations, particularly in combination with all the other violations of firearms laws and regulations, strongly indicates—and would have indicated to ATF during a properly conducted licensing investigation for JA Industries—that each of Jimenez's violations and misrepresentations was willful.

### D.    JA Industries

122.    On February 10, 2020, Jimenez Arms filed for bankruptcy with an outstanding $1.3 million federal tax bill and other liabilities totaling at least an additional $1 million.  Among these were actual and potential liabilities arising from lawsuits against Jimenez Arms, including a wrongful death action filed by the estate of a Kansas City man who was murdered using a Jimenez Arms pistol.

123.    Wasting little time, on or about March 20, 2020, Jimenez applied for an FFL for "JA Industries."  He again listed himself as the sole "responsible person" for the new entity and stated in connection with his application that JA Industries "does not sell firearms to non-licensees."

124.    While Jimenez Arms and JA Industries are different corporate entities on paper, they are functionally the same business producing functionally the same pistols.

125.    JA Industries, like Jimenez Arms, listed a business address in Henderson, Nevada.

126.    Jimenez Arms' website was active until at least November 2020 and made no reference to JA Industries.  Upon information and belief, JA Industries does not have a separate website.

127.    JA Industries is currently selling the same cheap, highly trafficked pistols as Jimenez Arms, including a model functionally identical to the popular "JA Nine."

128.    One firearms dealer in Alabama even posted the following message on its website:  "Jimenez Arms is back!!  The new company, JA Industries LLC, will start shipping firearms in the coming weeks, starting with the JA Nine and the JA 380."  It added that "JA Industries WILL honor the Jimenez Arms lifetime warranty[.]"[18]

129.    Because JA Industries conducts business in the same way as Jimenez Arms, it is inevitable that its nearly identical product will end up in the hands of violent criminals, inflicting further injury on each of the Plaintiffs.

130.    The willful misrepresentations and willful violations engaged in by Jimenez as the responsible person for Jimenez Arms are attributable to him as an individual and disqualify any company run by him, including JA Industries, from obtaining an FFL.

### E.    ATF's Failure to Investigate Jimenez

131.    On or about April 22, 2020, ATF purportedly conducted a firearms qualification inspection of JA Industries via telephone due to the COVID-19 pandemic. On or about April 29, 2020, ATF issued FFL #9-88-06010 to JA Industries.

---

[18] Jimenez Arms, Inc., Keel Mountain Munitions LLC, http://www.kmmunitions.com/jimenez.html (last visited Jan. 14, 2021).

132.    But ATF failed to conduct an adequate inquiry or investigation of JA Industries.

133.    Among other things, the deficiency of ATF's process is evident by the fact that JA Industries was granted an FFL:  Had ATF conducted a proper investigation—or any investigation whatsoever—that would not have happened.

134.    According to the ATF Operations Manual, the purpose of a firearms qualification inspection is, among other things, to "[e]nsure the applicant is qualified" and "[v]erify the accuracy of the application."  ATF regulations also direct the agency to approve a license application when it "find[s] through further inquiry or investigation, or otherwise, that the applicant is qualified."  27 C.F.R. § 478.47(a).  Consistent with the Operations Manual, courts have interpreted this provision to encompass the "duty to ensure the truthfulness of statements made on an application for a federal firearms license."[19]

135.    Jimenez was not a "qualified applicant" to receive an FFL under 18 U.S.C. § 923(c) because, as described in this Complaint, he did not meet the licensing qualifications under 18 U.S.C. § 923(d) due to his having willfully violated multiple provisions of the Gun Control Act and its regulations, as well as having willfully failed to disclose, and made false statements regarding, material facts.

136.    On his application for an FFL for JA Industries, Jimenez listed his prior employment with both Bryco and Jimenez Arms, both of which were known to ATF to have close ties to Jennings, who was prohibited from obtaining an FFL, and the Jennings family.

---

[19] *Morgan v. United States U.S. Dep't of Justice*, 473 F. Supp. 2d 756, 763 (E.D. Mich.), *aff'd sub nom. Morgan v. Fed. Bureau of Alcohol, Tobacco & Firearms*, 509 F.3d 273 (6th Cir. 2007) (quoting *Fattahi v. Bureau of Alcohol, Tobacco & Firearms*, 195 F. Supp. 2d 745, 747 n.5 (E.D. Va. 2002), *aff'd*, 328 F.3d 176 (4th Cir. 2003)).

137.    Had ATF done any kind of investigation into Jimenez's background in connection with the licensing process for JA Industries—including a review of its own files—it would have learned that he had collaborated extensively with Jennings in the management and operation of his prior firearms manufacturing business despite repeated, and illegal, attestations to the contrary.  It would have also discovered—as its own office in Kansas City had included in federal charging documents—that Jimenez and his prior company, Jimenez Arms, had previously shipped dozens of firearms to Samuels, an unlicensed individual who trafficked in firearms, despite numerous indications that doing so would violate the Gun Control Act.  Moreover, ATF's own enforcement records indicate that Jimenez and Jimenez Arms had committed recordkeeping violations of a type that undermine the purpose of the Gun Control Act, which is to prevent gun trafficking and other gun crimes.

138.    Accordingly, had ATF done such investigation it would have concluded that Jimenez was not a qualified applicant, and would not have granted the FFL.

139.    According to the ATF Operations Manual, another purpose of a firearms qualification inspection is to "[m]inimize the possibility of firearms being obtained by prohibited persons."

140.    The Manual also instructs ATF officials "to '[r]eview area office files' if the applicant has held a license in the past and to "[b]e alert for recent or ongoing criminal investigations of applicants or for persons previously associated with an administrative ATF action."

141.    ATF was aware that Jennings was prohibited under 18 U.S.C. § 922(g) from possessing firearms or shipping or transporting them in interstate commerce,

and that Jimenez had nevertheless allowed Jennings access to, and control over, his firearms business.

142.    According to the ATF Operations Manual, other purposes of a firearms qualification inspection include "[r]educ[ing] illegal diversion in firearms" and to "[r]educ[ing] violent crime and protect[ing] the public[.]"

143.    ATF was aware of Jimenez's association with traffickers like Samuels from its 2018 investigation of Samuels and of Jimenez's prior violations for failing adequately to account for Jimenez Arms' dispositions and inventory.  ATF was also aware that the types of guns manufactured by Jimenez are heavily trafficked and disproportionately used to commit crimes:  as noted above, an ATF investigator attested that he was unsurprised that a majority of the firearms trafficked by Samuels were Jimenez Arms pistols, because they are "commonly inexpensive" and profits could be made "by buying them at a low cost and selling them at marked up price to prohibited individuals."[20]

144.    As such, granting an FFL to JA Industries *increases* illegal diversion in firearms and *increases* violent crime and danger to the public, particularly in and around Kansas City, where Jimenez guns are heavily trafficked.

145.    According to the ATF Operations Manual, another purpose of a firearms qualification inspection is to "ensure the integrity of records systems . . . to facilitate the tracing of firearms[.]"

146.    As described herein, ATF was aware of Jimenez's recordkeeping violations that are consistent with gun trafficking.

---

[20] Affidavit for Criminal Complaint at ¶ 69, *United States v. Samuels*, No. 18-CR-00309-GAF (W.D. Mo. Oct. 1, 2018).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

(Issuance of a federal firearms license to an applicant who has failed to meet the criteria for licensure in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

147. Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

148. A reviewing court shall "hold unlawful and set aside agency action . . . found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

149. The Gun Control Act requires ATF to deny a license to an applicant who has, *inter alia*, "willfully violated any of the provisions of" the Gun Control Act, or "willfully failed to disclose any material information required" or "made any false statement as to any material fact" in connection with an application for an FFL. *See* 18 U.S.C. §§ 923(c), (d)(1)(C), (D); *see also* 27 C.F.R. § 478.47(a).

150. The Gun Control Act further requires ATF to deny a license to an applicant if a person who "directly or indirectly, [has] the power to direct or cause the direction of the management and policies" of the applicant's firearm business—*i.e.*, a responsible person—is prohibited from transporting, shipping or receiving firearms under 18 U.S.C. § 922(g). *See* 18 U.S.C. §§ 923(c), (d)(1)(B).

151. The Gun Control Act makes it unlawful to "engage in the business of importing, manufacturing, or dealing in firearms" without an FFL. 18 U.S.C. § 922(a)(1)(A).

152.    The Gun Control Act further makes it unlawful for an individual to make "any false statement or representation . . . in applying for a[] license" under the Act. 18 U.S.C. § 924(a).

153.    The Gun Control Act further makes it unlawful for licensees to "ship or transport in interstate or foreign commerce any firearm to any person" who does not possess an FFL.  18 U.S.C. § 922(a)(2).

154.    The Gun Control Act further makes it unlawful to sell or deliver a firearm to an unlicensed person who the licensee knows or has reasonable cause to believe does not reside in the state in which the licensee's place of business is located.  18 U.S.C. § 922(b)(3).

155.    The Gun Control Act further makes it unlawful to transfer a firearm to an unlicensed person before completing a background check.  18 U.S.C. § 922(t)(1).

156.    Jimenez willfully violated the Gun Control Act when he repeatedly made false representations to, and willfully withheld material information from, ATF about the extent of Jennings' involvement, and whether he was a responsible person, in Jimenez's business.

157.    Jimenez willfully aided and abetted a violation of the Gun Control Act when he permitted Jennings—who was prohibited from possessing firearms or shipping or transporting them in interstate commerce under 18 U.S.C. § 922(g), due to domestic violence and child pornography convictions—to play a controlling role in Jimenez Arms.

158.    Given ATF's knowledge of Jennings' association with Jimenez and central role in Jimenez Arms, Defendants had reason to believe Jennings would be a

responsible person in JA Industries as well, and so acted arbitrarily, capriciously and contrary to law by not also denying JA Industries' FFL on that basis. (Indeed, ATF previously denied a license to one of Jennings' prior companies because he was a responsible person.)

159.    Jimenez willfully violated the Gun Control Act when Jimenez Arms shipped multiple firearms to Samuels, a Missouri individual who Jimenez knew (or consciously avoided knowing) did not possess an FFL and who, as ATF learned in 2018, Jimenez knew intended to resell those firearms.

160.    Jimenez willfully violated the Gun Control Act when Jimenez Arms shipped multiple firearms to a new address for Samuels—Samuels' personal home in Kansas City, Missouri—without running a check on that address (which would have revealed it was the address of a non-licensee).

161.    Through this conduct, and by not alerting ATF or law enforcement that Samuels was engaging in the business of dealing firearms without a license, Jimenez aided and abetted Samuels' illegal trafficking operation in willful violation of the Gun Control Act.

162.    Jimenez repeatedly and willfully violated the Gun Control Act through his companies by failing to abide by statutory and regulatory recordkeeping requirements, including failing to properly account for the acquisition and disposition of firearms, as documented by multiple ATF inspection reports.

163.    Each of the willful violations and misrepresentations made by Jimenez as the responsible person for Jimenez Arms are attributable to him as an individual

and disqualify any company run by him, including now JA Industries, from obtaining an FFL.

164.   Each of these violations required ATF to deny Jimenez's application for an FFL for JA Industries.

165.   Given Jimenez Arms' history of Gun Control Act violations, ATF's decision to grant a new FFL to JA Industries was arbitrary and capricious.

166.   Nonetheless, ATF granted Jimenez's application.

167.   ATF's grant of the FFL for JA Industries was a final agency action.

168.   ATF's grant of the FFL for JA Industries was arbitrary, capricious and contrary to law.

### SECOND CLAIM FOR RELIEF
(Issuance of a federal firearms license after deficient investigation of the applicant's qualification for a license in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

169.   Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

170.   A reviewing court may "hold unlawful and set aside agency action . . . found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

171.   The Gun Control Act provides that FFLs may be issued only to "qualified" applicants.  *See* 18 U.S.C. § 923(c).

172.   ATF therefore cannot issue an FFL unless it first determines that an applicant is qualified under the Gun Control Act based, at a minimum, on an evaluation of the criteria listed in 18 U.S.C. § 923(d).

173.    ATF's regulations require that it issue a license only after it finds "through further inquiry or investigation, or otherwise, that the applicant is qualified[.]" 27 C.F.R. § 478.47(a).

174.    ATF's Industry Operations Manual prescribes procedures for conducting firearms qualifications inspections on original applications.  According to the manual, the purpose of a firearms qualification inspection is to "[e]nsure the applicant is qualified[,]" "[v]erify the accuracy of the application," "[d]etermine the applicant's ability to comply with Federal law and regulations," "[m]inimize the possibility of firearms being obtained by prohibited persons," "[r]educe illegal diversion of firearms," "ensure the integrity of records systems . . . to facilitate the tracing of firearms" and "[r]educe violent crime and protect the public."  The Industry Operations Manual also instructs ATF inspectors "to determine if responsible persons" for the applicant's business "are prohibited."

175.    ATF was aware, including having concrete evidence, that Jimenez had violated the Gun Control Act and ATF regulations on numerous prior occasions, and had reason to know that Jimenez and his operation required careful scrutiny in connection with his application for an FFL.

176.    Despite this knowledge, ATF did not conduct an adequate investigation in connection with Jimenez's application for an FFL for JA Industries.

177.    ATF did not adequately investigate whether Jimenez met the criteria set out in 18 U.S.C. § 923(d).

178.   ATF did not adequately investigate whether Jimenez was truthful in his statements and representations made to ATF in the course of the FFL application process.

179.   Had ATF conducted a reasonable investigation of Jimenez and JA Industries, it would have determined that Jimenez was not qualified to receive an FFL.

180.   ATF failed to determine "through further inquiry or investigation, or otherwise," 27 C.F.R. § 478.47(a), that Jimenez was qualified for an FFL on behalf of JA Industries.

181.   After failing to conduct an adequate investigation into Jimenez's qualifications to receive an FFL, ATF granted Jimenez's application for an FFL for JA Industries.

182.   ATF's grant of an FFL for JA Industries was a final agency action.

183.   ATF's grant of an FFL for JA Industries after an inadequate investigation of Jimenez's qualifications was arbitrary, capricious and contrary to law.

## REQUESTED RELIEF

Wherefore, Plaintiffs request that this Court:

a.   Declare that Defendants' grant of an FFL was arbitrary, capricious and contrary to law in violation of the APA;

b.   Set aside Defendants' decision to grant an FFL to JA Industries or order Defendants to revoke the FFL; and

c.   Order that Defendants conduct a reasonable investigation into Jimenez's qualifications to receive an FFL for JA Industries.

In addition, Plaintiffs request that this Court:

a.   Award Plaintiffs their costs and reasonable attorneys' fees incurred in bringing this action; and

b.   Grant other such relief as this Court deems just and proper.

January 15, 2021

CRAVATH, SWAINE & MOORE LLP,

by     /s/ Benjamin Gruenstein

Benjamin Gruenstein
Sharonmoyee Goswami
Samantha Hall
Joseph H. Margolies

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
bgruenstein@cravath.com
sgoswami@cravath.com
shall@cravath.com
jmargolies@cravath.com

EVERYTOWN LAW

Alla Lefkowitz
Molly Thomas-Jensen
Aaron Esty
Ryan Gerber*
*S.D.N.Y. Admission application forthcoming

450 Lexington Ave.
P.O. Box #4184
New York, NY 10017
(646) 324-8365
alefkowitz@everytown.org
mthomasjensen@everytown.org
aesty@everytown.org
rgerber@everytown.org

*Attorneys for Plaintiffs Kansas City, Missouri
and Everytown for Gun Safety Support Fund*

KWAME RAOUL
Attorney General of Illinois

by

_____
Kathryn Hunt Muse
Office of the Attorney General

100 West Randolph Street
Chicago, IL 60601
(312) 814-3000
kmuse@atg.state.il.us
*Attorney for Plaintiff State of Illinois*