# OPERATING AGREEMENT

## OF

## JA INDUSTRIES LLC

## A NEVADA LIMITED LIABILITY COMPANY

3 30, 2015

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THIS OPERATING AGREEMENT OR THE LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS ("INTERESTS") PROVIDED FOR HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE COMPANY IS UNDER NO OBLIGATION TO REGISTER THE INTERESTS UNDER THE SECURITIES ACT IN THE FUTURE.

AN INTEREST MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. ADDITIONAL RESTRICTIONS ON THE TRANSFER OF INTERESTS ARE CONTAINED IN SECTION 7 OF THIS AGREEMENT. BASED UPON THE FOREGOING, EACH ACQUIRER OF AN INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.

ATF0943

THIS OPERATING AGREEMENT of JA INDUSTRIES LLC, a Nevada limited liability company, is entered into as of ⟨3 30⟩ 2015.

# SECTION 1

## DEFINITIONS

1.1     *Specific Definitions*.  As used in this Agreement:

*Act* shall mean Nevada Limited Liability Company Act, Nev. Rev. Stat. Sections 86.011 to 86.571, as amended from time to time.

*Additional Member* shall mean any Person, other than a Substitute Member, admitted to the Company as a Member after the date first above written.

*Affiliate* shall mean, with respect to any Person, any other Person with regard to which the Person is controlling, controlled or commonly controlled.  For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of a Person, whether through ownership of voting securities, by agreement, or otherwise.

*Agreement* shall mean this Operating Agreement of JA Industries LLC, a Nevada limited liability company, including all schedules, appendices, and exhibits hereto, as amended in accordance with the terms hereof.

*Allocation Percentage* shall mean, for each Member, as of the date of determination, the percentage specified for such Member on Schedule A (as adjusted pursuant to this Agreement).

*Assignee* shall mean a Person that has acquired all or any portion of an Interest (including by means of a Transfer permitted under Section 7), but that has not been admitted as a Member.

*Bankruptcy* shall mean, with respect to a Member: (i) an assignment of all or substantially all of the assets of such Member for the benefit of its creditors generally; (ii) the commencement of any bankruptcy or insolvency case or proceeding against such Member which shall continue and remain unstayed and in effect for a period of sixty (60) consecutive days; (iii) the filing by such Member of a petition, answer or consent seeking relief under any bankruptcy, insolvency or similar law; or (iv) the occurrence of any other event that is deemed to constitute bankruptcy for purposes of the Act.

*Business* shall mean the actions, operations and activities associated with the business of management and holding.

*Capital Account* shall mean, for each Member, a separate account that is:

(a)     Increased by: (i) the amount of such Member's Capital Contribution and (ii) allocations of Profit to such Member pursuant to Section 4;

1

ATF0944

(b)     Decreased by: (i) the amount of cash distributed to such Member by the Company, (ii) the Fair Market Value of any other property distributed to such Member by the Company (determined as of the time of distribution, without regard to Section 7701(g) of the Code, and net of liabilities secured by such property that the Member assumes or to which the Member's ownership of the property is subject) and (iii) allocations of Loss to such Member pursuant to Section 4;

(c)     Revalued in connection with any event described in Treasury Regulation Section 1.704-1(b)(2)(iv)(f); and

(d)     Otherwise adjusted so as to conform to the requirements of Sections 704(b) and (c) of the Code and the Treasury Regulations issued thereunder.

*Capital Commitment* shall have the meaning set forth in Section 3.1(a).

*Capital Contribution* shall mean, for any Member, the sum of the net amount of cash and the Fair Market Value of any other property (determined as of the time of contribution, without regard to Section 7701(g) of the Code, and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by such Member to the capital of the Company. The term "capital contribution" (where not capitalized) shall mean any contribution to the capital of the Company valued in accordance with the rules set forth in the preceding sentence. For purposes of this Agreement, each capital contribution shall be deemed to have been made at the later of: (i) the Close of Business on the due date of such capital contribution as determined in accordance with this Agreement; or (ii) the Close of Business on the date on which such capital contribution is actually received by the Company.

*Close of Business* shall mean 5:00 p.m., local time, in Las Vegas, Nevada.

*Code* shall mean the United States Internal Revenue Code of 1986, as amended.

*Company* shall mean JA Industries LLC, a Nevada limited liability company.

*Defaulting Member* shall have the meaning set forth in Section 3.4.

*Derivative Company Interest* shall mean any actual, notional or constructive interest in, or right in respect of, the Company (other than a Member's total interest in the capital, profits and management of the Company) that, under Treasury Regulation Section 1.7704-1(a)(2), is treated as an interest in the Company for purposes of Section 7704 of the Code. Pursuant to the foregoing, "Derivative Company Interest" shall include any financial instrument that is treated as debt for Federal income tax purposes and (i) is convertible into or exchangeable for an interest in the capital or profits of the Company or (ii) provides for one (1) or more payments of equivalent value.

*Dispute Notice* shall have the meaning set forth in Section 6.14(b).

*Dissolution* shall mean, with respect to a legal entity other than a natural person, that such entity has "dissolved" within the meaning of the partnership, corporation, limited liability company, trust or other statute under which such entity was organized.

*Fair Market Value* shall have the meaning set forth in Section 6.14(c).

ATF0945

*Fiscal Year* shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

*Indemnified Person* shall mean each Managing Member and each equity-holder, member, director, officer, employee, or agent of a Managing Member. In addition, "Indemnified Person" shall mean any Non-Managing Member, employee or agent of the Company to the extent determined by the Managing Members in their reasonable discretion. A Person that has ceased to hold a position that previously qualified such Person as an Indemnified Person shall be deemed to continue as an Indemnified Person with regard to all matters arising or attributable to the period during which such Person held such position.

*Interest* shall mean, for each Member, such Member's rights, duties and interest in respect of the Company in such Member's capacity as such (as distinguished from any other capacity such as employee, debtor or creditor) and shall include such Member's right, if any, to vote on Company matters, bind the Company vis-à-vis third parties, or receive distributions as well as such Member's obligation, if any, to provide services, make capital contributions or take any other action. In the case of an Interest held by an Assignee, such Interest shall be limited in the manner set forth in Section 7.99.

*Liquidating Member* shall mean the Managing Member identified as such, from time to time, by the Managing Members; provided, however, that: (i) for any period during which no Managing Member has been so identified, the Liquidating Member shall be the Managing Member having the largest Allocation Percentage; and (ii) for any period during which there are no Managing Members, the Liquidating Member shall be the Member identified as such, from time to time, by a Majority-In-Interest of the Non-Managing Members. The Liquidating Member initially shall be the Managing Member.

*Majority-In-Interest of the Members, Managing Members or Non-Managing Members* shall mean a group of Members, Managing Members or Non-Managing Members whose aggregate Allocation Percentages at the time of determination exceed fifty-one percent (51%) of the total Allocation Percentages of all the Members, Managing Members or Non-Managing Members, as applicable, at such time.

*Managing Member* shall mean each Person listed on Schedule A as such, for so long as such Person does not become a Withdrawn Member. Except where the context otherwise requires, or as provided in Section 6.1(b), a reference in this Agreement to "the Managing Members" shall mean all of the Managing Members (taken together or acting unanimously, as appropriate).

*Material Misconduct* shall mean, with respect to an Indemnified Person, gross negligence, willful and material breach of this Agreement, fraud, or the commission of a felony (except in the case of a felony where the Indemnified Person reasonably believed that no such felony would occur in consequence of such Indemnified Person's action or inaction, as the case may be). For purposes of the preceding sentence: (i) an Indemnified Person shall be deemed to have acted in good faith and without negligence with regard to any action or inaction that is taken in accordance with the advice or opinion of an attorney, accountant or other expert advisor so long as such advisor was selected with reasonable care and the Indemnified Person made a good faith effort to inform such advisor of all the facts pertinent to such advice or opinion; and (ii) an Indemnified Person's reliance upon the truth and accuracy of any written statement, representation or warranty of a Member shall be deemed to have been reasonable and in good faith absent such Indemnified Person's actual knowledge that such statement, representation or warranty was not, in fact, true and accurate.

*Member* shall mean any Person (i) listed on Schedule A as a Member or (ii) admitted to the Company pursuant to the terms of this Agreement as an Additional Member or a Substitute Member, but in each case only if such Person has not become a Withdrawn Member. A Member shall not cease to be a Member or lose

ATF0946

its non-economic rights in respect of the Company solely by virtue of having Transferred to one (1) or more Persons its entire economic interest in the Company. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members (taken together or acting unanimously, as appropriate).

*Member Nonrecourse Deduction* shall mean an item of loss, expense or deduction attributable to a nonrecourse liability of the Company for which a Member bears the economic risk of loss within the meaning of Treasury Regulation Section 1.704-2(i).

*Minimum Gain* of the Company shall, as provided in Treasury Regulation Section 1.704-2, mean the total amount of gain the Company would realize for Federal income tax purposes if it disposed of all assets subject to nonrecourse liability for no consideration other than full satisfaction thereof.

*Non-Managing Member* shall mean any Member other than a Managing Member. Except where the context requires otherwise, a reference in this Agreement to "the Non-Managing Members" shall mean all of the Non-Managing Members (taken together or acting unanimously, as appropriate).

*Nonrecourse Deduction* shall mean an item of loss, expense or deduction (other than a Member Nonrecourse Deduction) attributable to a nonrecourse liability of the Company within the meaning of Treasury Regulation Section 1.704-2(b).

*Objecting Member* shall have the meaning set forth in Section 6.14(b).

*Permanent Incapacity* shall mean, with respect to an individual, that such individual suffers a mental or physical disability which, as of the time of determination, renders such individual incapable of performing such individual's duties under this Agreement and is substantially certain to continue to render such individual incapable of performing such duties for a continuous period of at least six (6) months following the date of determination.

*Person* shall mean an individual, partnership, corporation, Limited Liability Company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

*Preferred Interest Rate* shall mean twelve percent (12%) interest per annum.

*Principal Office* shall have the meaning set forth in Section 2.4.

*Profits and Losses* shall mean, for any period, the Company's items of income and gain (including items not subject to Federal income tax) as well as items of loss, expense and deduction (including items not deductible, depreciable, amortizable or otherwise excludable from income for Federal income tax purposes), respectively, as determined under Federal income tax principles; provided, however, that Profits and Losses attributable to assets with a book value that differs from tax basis (as determined under Federal income tax rules) shall be determined with regard to such book value in the manner required under Treasury Regulation Section 1.704-1(b).

*Securities Act* shall mean the United States Securities Act of 1933, as amended, including the rules and regulations promulgated thereunder.

*State* shall mean any constituent state of the United States, as well as the District of Columbia.

ATF0947

**Substitute Member** shall mean a transferee of all or a portion of a Member's Interest that becomes a Member and succeeds, to the extent of the Interest transferred, to the rights and powers and becomes subject to the restrictions and liabilities of the transferor Member.

**Tax Matters Partner** shall initially mean Pablo J. Jimenez, but may mean such Member identified as such, from time to time, by the Managing Members; provided, however, that: (i) for any period during which no Managing Member has been so identified, the Tax Matters Partner shall be the Managing Member having the largest Allocation Percentage; and (ii) for any period during which there are no Managing Members, the Tax Matters Partner shall be the Member identified as such, from time to time, by a Majority-In-Interest of the Non-Managing Members.

**Term** shall have the meaning set forth in Section 2.2. Where not capitalized, "term" shall mean the entire period of the Company's existence, including any period of winding-up and liquidation following the Dissolution of the Company pursuant to Section 8.1.

**Termination** shall mean, with respect to a legal entity other than a natural person, that such entity has Dissolved, completed its process of winding-up and liquidation, and otherwise ceased to exist.

**Transfer** shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

**Treasury Regulation** shall mean a regulation issued by the United States Treasury Department and relating to a matter arising under the Code.

**Two-Thirds-Interest of the Members, Managing Members or Non-Managing Members** shall mean a group of Members, Managing Members or Non-Managing Members whose aggregate Allocation Percentages at the time of determination equal or exceed two-thirds (2/3) of the total Allocation Percentages of all the Members, Managing Members or Non-Managing Members, as applicable, at such time.

**United States** shall mean the United States of America.

**Updated Capital Account** shall mean, with respect to a Member, such Member's Capital Account determined as if, immediately prior to the time of determination, all of the Company's assets had been sold for Fair Market Value and any previously unallocated Profits or Losses had been allocated pursuant to Section 4.

**Valuation Notice** shall have the meaning set forth in Section 6.14(a).

**Withdrawal Event** shall have the meaning set forth in Section 7.8.

**Withdrawn Member** shall have the meaning set forth in Section 7.7.

1.2     **General Usage**. The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Except where the context clearly requires to the contrary: (i) each reference in this Agreement to a designated "Section," "Schedule," "Exhibit," or "Appendix" is to the corresponding Section, Schedule, Exhibit, or Appendix of or to this Agreement; (ii) instances of gender or entity-specific usage (e.g., "his" "her" "its" "person" or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (iii) the word "or" shall not be applied in its exclusive sense; (iv) "including" shall mean "including,

5

ATF0948

without limitation"; (v) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto; (vi) references to "$" or "dollars" shall mean the lawful currency of the United States; (vii) references to "Federal" or "federal" shall be to laws, agencies or other attributes of the United States (and not to any State or locality thereof); (viii) the meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States; (ix) references to "days" shall mean calendar days; references to "business days" shall mean all days other than Saturdays, Sundays and days that are legal holidays in the State of Nevada; (x) references to months or years shall be to the actual calendar months or years at issue (taking into account the actual number of days in any such month or year); (xi) days, business days and times of day shall be determined by reference to local time in Las Vegas, Nevada; and (xii) the English language version of this Agreement shall govern all questions of interpretation relating to this Agreement, notwithstanding that this Agreement may have been translated into, and executed in, other languages.

## SECTION 2

## FORMATION

2.1     *Formation and Name*.

(a)     The Company was formed on March 30, 2015. The Members hereby enter into and form the Company as a limited liability company in accordance with the Act.

(b)     The name of the Company shall be "JA Industries LLC".

2.2     *Term*. The "Term" of the Company began on March 30, 2015 and shall continue for a perpetual term. Except as specifically provided in Section 8.1, the Company shall not be Dissolved prior to the end of its Term.

2.3     *Purpose and Scope*. Within the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act.

2.4     *Principal Office*. The Company shall have a single "Principal Office" which shall at all times be located within the United States. The Principal Office shall be located at a destination determined by the Managing Members, and may thereafter be changed from time to time by the Managing Members upon notice to the Members.

2.5     *Nevada Office and Agent*. The Company shall maintain a Nevada registered office and agent for service of process as required by the Act. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Managing Members shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

ATF0949

2.6     **Admission of Members and Additional Members.**

(a)     Each Person that has executed this Agreement and whose name is listed on Schedule A is hereby admitted as a Managing Member or a Non-Managing Member, as indicated on such Schedule.

(b)     Additional Members may be admitted as Managing Members or Non-Managing Members, from time to time upon approval by Two-Thirds Interest of the Members.  The Capital Commitment (as well as the timing of required capital contributions in respect thereof) and Allocation Percentage of each Additional Member shall be determined by the Managing Members and set forth on Schedule A. The Allocation Percentage of each Additional Member shall dilute the Allocation Percentages of the previously admitted Members in proportion to their respective Allocation Percentages as in effect immediately to such dilution.

(c)     A Person shall not be admitted as an Additional Member prior to the execution by such Person of this Agreement (including Schedule A, as updated to reflect such Person's Interest).

(d)     Notwithstanding the foregoing provisions of this Section 2.6, the provisions of Section 7 shall apply with regard to the admission of Substitute Members.

2.7     **Names and Contact Information of the Members.**  Set forth below the name of each Member on Schedule A shall be appropriate contact information for such Member (including such Member's mailing address, telephone number, and facsimile number as well as, in the case of a Member that is an entity, the name or title of an individual to whom notices and other correspondence should be directed).  Each Member shall promptly provide the Company with the information required to be set forth for such Member on Schedule A and shall thereafter promptly notify the Company of any change to such information.

2.8     **Additional Documents.**

(a)     The Managing Members shall cause to be executed, filed, recorded, published, or amended any documents, as the Managing Members in their reasonable discretion determine to be necessary or advisable: (i) in connection with the formation, operation, Dissolution, winding-up, or Termination of the Company pursuant to applicable law or (ii) to otherwise give effect to the terms of this Agreement.  The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

(b)     Each Non-Managing Member hereby grants to each Managing Member a special power of attorney (with full rights of assignment) irrevocably appointing such Managing Member as the granting Non-Managing Member's attorney-in-fact with power and authority to execute or acknowledge, in the granting Non-Managing Member's name and on its behalf, any document described in Section 2.8(a). Each special power of attorney granted under this Section 2.8(b) is coupled with an interest and shall not be revoked by the bankruptcy, death, disability or other event of legal incapacity of the granting Non-Managing Member.

2.9     **Title to Property.**  Title to all Company property shall be held in the name of the Company; provided, however, that publicly traded securities may be held in "street name" or through a similar arrangement with a reputable financial institution.

7

ATF0950

# SECTION 3

## CAPITALIZATION

3.1    ***Capital Commitments***.

(a)    ***Initial Capital Commitments***. Each Member hereby makes a Capital Commitment equal to the amount set forth as such Member's Capital Commitment on Schedule A. Except as specifically provided in this Agreement, the "Capital Commitment" of a Member: (i) shall represent the maximum aggregate amount of cash and property that such Member shall be required to contribute to the capital of the Company; and (ii) shall not be changed during the term of the Company.

(b)    ***Increased Capital Commitments***. The Capital Commitments of the Members may be increased (in proportion to the Members' respective Allocation Percentages) at such times and in such amounts as shall be determined by the Managing Members based upon their good faith determination that any such increase is necessary or advisable for the proper and effective functioning of the Company; provided, however, that the Capital Commitments of the Non-Managing Members may be increased, in the aggregate, under this Section 3.1(b) by more than twenty-five percent (25%) (based upon the aggregate Capital Commitments of the Non-Managing Members determined without regard to any increases pursuant to this Section 3.1(b)) only with the consent of a Majority-In-Interest of the Non-Managing Members. The Members shall be promptly notified of any increase to their Capital Commitments pursuant to this Section 3.1(b). The Managing Members may decline to increase the Capital Commitments of the Members pursuant to this Section 3.1(b) in the Managing Members' sole and absolute discretion.

3.2    ***Capital Contributions***. Except to the extent set forth on Schedule A or provided in Section 3.8, all capital contributions shall be in cash. The obligation of a Member to satisfy its Capital Commitment shall be without interest (other than in the case of default as provided in Section 3.4). Capital Contributions otherwise required to be made by a Member under Section 3.1 shall be due and payable, upon not less than ten (10) days' notice, only at such times and in such amounts as shall be specified in one (1) or more capital calls issued by the Managing Members. The Managing Members may decline to issue a capital call in their sole and absolute discretion.

3.3    ***Limitation on Capital Contributions***. Except as specifically provided in Agreement, no Person shall be permitted or required to make a contribution to the capital of the Company.

3.4    ***Penalties for Failure to Make Required Contributions***. In the event that a Member fails to timely make a capital contribution as required pursuant to this Agreement (a "Defaulting Member"), such Member shall be subject to any and all penalties and remedies available at law or equity, as selected by the Managing Members. Without limitation on the preceding sentence, the Managing Members may require that a Defaulting Member withdraw from its status as a Member or forfeit up to one-half (1/2) of its Allocation Percentage.

ATF0951

3.5     ***Withdrawal and Return of Capital.***

(a)     No Member may withdraw any portion of its Capital Contribution or Capital Account balance. Except as provided in Sections 5 and 8, no Member shall be entitled to the return of such Member's Capital Contribution, a distribution in respect of such Member's Capital Account balance, or any other distribution in respect of such Member's Interest.

(b)     No Member shall have priority over any other Member as to distributions of Distributable cash.

3.6     ***Loans to the Company.***

(a)     No Member shall be required to lend any money to the Company or to guaranty any Company indebtedness, but may lend money to the Company upon the approval of the Managing Members. Any loans made to the Company and approved by the Managing Members shall accrue interest equal to the Preferred Interest Rate.

(b)     Except as otherwise provided in this Agreement, any Member who lends money to the Company shall be deemed a general creditor of the Company and not a Member for the purpose of paying interest and principal of any such loan.

3.7     ***Interest on Capital.*** No Member shall be entitled to interest on such Member's Capital Contribution, Capital Account balance, or share of unallocated Profits, but may be entitled to interest pursuant to Section 3.6.

3.8     ***Limitation of Liability; Return of Certain Distributions.***

(a)     Except as otherwise required by applicable law, a Member shall have no personal liability for the debts and obligations of the Company.

(b)     A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under applicable law shall return such distribution within thirty (30) days after demand therefor by any Member. A Defaulting Member shall return within thirty (30) days after demand therefor by any Managing Member any distribution the return of which is necessary or convenient to give effect to the provisions of Section 3.4. The Company may elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member.

(c)     Nothing in this Section 3.8 shall be applied to release any Member from (i) its obligation to make capital contributions or other payments specifically required under this Agreement or (ii) its obligations pursuant to any relationship between the Company and such Member acting in a capacity other than as a Member (including, for example, as a borrower or independent contractor).

3.9     ***Contributed Property.*** With respect to any property contributed by a Member to the Company, such Member shall provide to the Company any information reasonably requested by the Company for purposes of determining the Company's tax basis in such property.

ATF0952

## SECTION 4
## PROFITS AND LOSSES

4.1     *Allocations of Company Profits and Losses*.

(a)     *General*.   Except as otherwise provided in this Section 4, the items of Company Profit and Loss for each fiscal quarter (or shorter period selected by the Managing Members) shall be allocated among the Members in proportion to their respective Allocation Percentages.

(b)     *Book - Tax Accounting Disparities*.   If Company property is reflected in the Capital Accounts of the Members at a value that differs from the adjusted tax basis of such property (whether because such property was contributed to the Company by a Member or because of a revaluation of the Members' Capital Accounts under Treasury Regulation Section 1.704-1(b)), allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members in a manner which takes such difference into account in accordance with Code Section 704(c) and the Treasury Regulations issued thereunder.

(c)     *Allocations in Event of Transfer*.   If an Interest is Transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made using any method selected by the Managing Members and permitted under Section 706 of the Code.

(d)     *Adjustment to Capital Accounts for Distributions of Property*.   If property distributed in kind is reflected in the Capital Accounts of the Members at a book value that differs from the Fair Market Value of such property at the time of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of this Section 4.1.

4.2     *Allocation of Liabilities*.   Solely for purposes of determining the Members' respective shares of the nonrecourse liabilities of the Company within the meaning of Treasury Regulation Section 1.752-3(a)(3), each Member's interest in Company Profits shall be equal to the ratio that such Member's Allocation Percentage bears to the aggregate Allocation Percentages of the Members.

4.3     *Modifications to Preserve Underlying Economic Objectives*.   If, in the opinion of counsel to the Company, there is a change in the Federal income tax law (including the Code as well as the Treasury Regulations, rulings, and administrative practices thereunder) which makes it necessary or prudent to modify the allocation provisions of this Section 4 in order to preserve the underlying economic objectives of the Members as reflected in this Agreement, the Managing Members shall make the minimum modification necessary to achieve such purpose.

ATF0953

# SECTION 5

## DISTRIBUTIONS

5.1     ***Determination of Net Income or Loss.*** For the purposes of this Agreement, the net income or loss of Company for any accounting period shall be its gross income less Company's expenses during that period, determined on an accrual basis in accordance with generally accepted accounting principles. Gross income shall include, but shall not be limited to, amounts received upon or in respect of investments of Company, gains realized upon the sale or disposition of any property, and any other income received by Company. Expenses shall include, but shall not be limited to, the expenses of conducting the business, salaries, interest on any loans or borrowings by Company (including any loans or advances to Company by any Member), taxes and assessments assessed to Company or levied upon its properties and payable by it, depreciation of and losses on Company's property (using any method of depreciation the Managing Member deems appropriate), bad debts and contingencies for which reserves should properly be established, and any and all other expenses incidental to the conduct of the business of Company.

5.2     ***Distributions of Net Income.*** Unless the Managing Members shall determine in good faith that Company reasonably needs to retain net income to meet its obligations or to maintain a sound financial condition in light of Company's reasonable financial needs, and subject to the requirements of the *Nevada Revised Statutes* section 86.343, the net income of Company in excess of Fifty-Thousand Dollars ($50,000.00) for each quarter shall be distributed by Company not later than thirty (30) calendar days after the end of each such period as follows: Each Member listed in Schedule A shall be entitled to receive a dividend distribution at the annual rate of three percent (3%), based on the Members' respective Allocation Percentages. All other income of Company shall be retained by Company.

5.3     ***Other Distributions.*** By Consent of the Members, Company may make further distributions ratably per share if the reasonable financial needs of Company permit it.

5.4     ***Liquidating Distributions.*** Notwithstanding the provisions of Section 5.1, cash or property of the Company available for distribution upon the Dissolution of the Company (including cash or property received upon the sale or other disposition of assets in anticipation of or in connection with such Dissolution) shall be distributed in accordance with the provisions of Section 8.2.

5.5     ***Limitation on Distributions.*** No distribution shall be made to a Member pursuant to Section 5.2 if and to the extent that such distribution would: (i) create a negative balance in the Updated Capital Account of such Member or increase the amount by which such Updated Capital Account balance is negative; (ii) cause the Company to be insolvent; or (iii) render the Member liable for a return of such distribution under applicable law.

5.6     ***No Right to Distributions of Property.*** Except as otherwise provided in this Agreement, a Member shall have no right to require that distributions to such Member consist of any specific item or items of property.

11

ATF0954

# SECTION 6

## ADMINISTRATION

6.1 ***Management Powers and Authority of the Managing Members***. Except as otherwise specifically provided in this Agreement:

(a) The Company and its business shall be managed, controlled and operated exclusively by the Managing Members, who shall be the "managers" of the Company within the meaning of Section 86.071 of the Act and shall have all of the powers and authority in respect of the Company permitted to managers under the Act; and

(b) As among the Managing Members, the determination by a Majority-In-Interest of the Managing Members to take any action or make any decision (for, in respect of, or on behalf of, the Company) shall control.

(c) Notwithstanding Sections 6.1(a) and 6.1(b), any business expense between the amounts of Five Thousand Dollars ($5000.00) and Forty-Nine Thousand Nine Hundred and Ninety-Nine Dollars and Ninety-Nine Cents ($49,999.99), shall require the approval of at least a Two-Thirds-Interest of Managing Members or Officers; and any business expense in the amount of Fifty-Thousand Dollars ($50,000.00) or more, shall require the approval of one-hundred percent (100%) of all Managing Members or Officers.

6.2 ***Management Rights and Powers of the Non-Managing Members***. Except as specifically set forth in this Agreement, the Non-Managing Members shall take no part in the management, control or operation of the Company or its business and shall have no power or authority to act for the Company, bind the Company under agreements or arrangements with third parties, or vote on Company matters.

6.3 ***Non-Managing Members Voting Rights***. Seventy Five Percent (75%) Interest of Members shall be required to approve any of the following actions by Company, and each Member hereby waives any right to taking any of such actions by approval, consent or vote of a lesser percentage:

(a) Amendment or repeal or alteration in any provision of the Operating Agreement of the Company as set forth in Section 10.5;

(b) Merger or consolidation of Company;

(c) Transfer of all or substantially all of Company;

(d) Issuance of any Interest or any options or rights to acquire Interest of the Company which would dilute the Interest of other Members; or

(e) Conversion of the Company into a different type of entity.

12

ATF0955

6.4     *Managing Members' Power to Bind the Company*.

(a)     Notwithstanding any provision of this Agreement to the contrary, any contract, agreement, deed, lease, note or other document or instrument executed on behalf of the Company by a Managing Member shall be deemed to have been duly executed by the Company; no other Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon each Managing Members' power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied.

(b)     Each Managing Member is hereby authorized to file with any governmental entity, on behalf of the Company and the Members, a certificate or similar instrument that evidences the Managing Members' power to bind the Company as set forth in the preceding paragraph (a).

6.5     *Noncompetition, Non-circumvention & Trade Secrets*

*Noncompetition*.  Each Member agrees to refrain from carrying on, directly or indirectly (either as a proprietor, partner, stockholder, officer, director, agent, employee, consultant, trustee, affiliate, or otherwise) within the state of Nevada, county of Clark, any business competitive in any respect with the Business of Company.  This Agreement shall continue during the time this Agreement is in effect with respect to that Member, and for one (1) year after the date of the last transfer of that Member's interest in the Company in a manner so that no Interest of the Company is owned by the Member or any member of that Member's family. For the purposes of this Agreement with respect to any Member, the Business of Company shall include, but shall not be limited to, the actions, operations and activities associated with the business of management and holding, any business in which Company is engaged while this Agreement is in effect with respect to that Member, and any business of Company in which it is engaged on the date of the last transfer of Interest referred to in the second sentence of this subsection, *provided, however,* that, during any period when this Section 6.5 would otherwise require a Member to refrain from competition as set forth above, Company is not conducting any portion of that business, the agreement of that Member in this subsection shall not apply to that portion of the business.  As used herein, the phrase "within the county of" includes the carrying on of a business which may be located elsewhere but which involves sales or activity within that county. A business shall be deemed to be competitive with Company if it provides any type of product or service which has been designed, distributed, or otherwise promoted by Company or which is competitive therewith or any other products which are or would be in any way competitive with the products manufactured, produced, sold, provided, or distributed by Company, or services rendered by Company.  It is agreed that Company's business plans at the time of this Agreement contemplate substantial geographical, product line and service expansion of the Business of Company, and that the Members intend that this subsection be construed to afford Company and the Members who are not alleged to have breached or violated this subsection the widest possible protection permitted by applicable law.  Notwithstanding the foregoing, it shall not be a breach of the provisions of this subsection for any Member to own, as a passive investment, not more than five percent (5%) of the outstanding stock of a publicly held company engaged in any of the above activities.

(a)     The Members intend that the covenants and agreements set forth in this subsection shall be construed as a series of separate covenants, one (1) for each geographic area covered and, except for geographical coverage, each separate covenant shall be deemed identical in terms.

(b)     *Non-Circumvention.*  Each Member agrees that during the Term of this Agreement, and for a period of one (1) year thereafter, said Member shall not, directly or indirectly, attempt in any manner to deal with any of the contacts and/or clients or other individuals or companies related to the

13

Company's Business, including by having any part of or deriving any benefit from the dealing, or by-pass, compete, avoid, circumvent, or attempt to circumvent the Company relative to its Business opportunities including by utilizing any of the Confidential Information or Trade Secrets or by otherwise exploiting or deriving any benefit from the Company's Confidential Information or Trade Secrets.

(c) **Trade Secrets**. The Members acknowledge that the customer lists, trade secrets, processes, formulae, methods, and technical information of Company and any other matters that may be designated as confidential by the Managing Members or by Consent of the Members of Company are valuable and unique assets. Each Member agrees never, without the prior written consent of Managing Members, directly or indirectly to disclose to any person, or use for any purpose whatsoever, except in authorized connection with the Business of Company, any list or any name appearing on any such list, or any trade secret, process, or other matter referred to above while the Member is an officer, director, employee, managing member, or member of Company or at any time thereafter.

(d) **Protection; Injunctive Relief**. The Members acknowledge that compliance with this Section 6.5 of this Agreement is necessary to protect the business, goodwill, and proprietary interests of the Company and Members, and the Members agree that any breach by a transferring Member of the provisions hereof shall entitle the Company to injunctive relief in addition to any other rights and remedies provided by law.

(e) **Severability of Provisions of Section 6.5**. To the extent that any element of this Section 6.5 shall be found unreasonable, the parties hereto agree that a lesser restriction, found to be reasonable, may be enforced against the transferring Member. The provisions of this Section 6.5 are severable, and if any one (1) or more provisions may be determined to be judicially unenforceable, in all or in part, the remaining provisions shall nevertheless be binding and enforceable.

6.6 **Duties to the Company**. The Managing Members shall devote to the Company such reasonable amounts of time, effort and attention as shall be necessary to cause the Company and its business to be diligently and prudently managed.

6.7 **Officers**.

(a) The Managing Members may, in their sole and absolute discretion, appoint, replace and remove, from time to time, Company officers to whom the Managing Members shall delegate such powers, authority and duties in respect of the Company as the Managing Members shall determine.

6.8 **Member Expenses**.

(a) **General**. Except as otherwise provided in this Section 6.8, no Member shall be reimbursed for expenses incurred on behalf of, or otherwise in connection with, the Company. Any reimbursement paid by a third party for expenses actually reimbursed by the Company shall be retained by (or paid over by the recipient thereof to) the Company.

(b) **Managing Members**. Each Managing Member shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred by such Managing Member on behalf of the Company, subject to Section 6.1(c) and provided, however, that a Managing Member shall receive more than Ten Thousand Dollars ($10,000.00) in respect of expenses incurred on behalf of the Company during any specific Fiscal Year only with the approval of the Managing Members.

14

ATF0957

(c)    ***Non-Managing Members***.    Non-Managing Members shall be reimbursed for expenses incurred on behalf of the Company only with the approval of the Managing Members in their reasonable discretion.

6.9    ***Member Compensation***. The Company shall not be obligated to pay a salary, bonus or similar compensation to any Member in respect of services provided to the Company by such Member in its capacity as such, but the Company may pay salaries, bonuses or similar types of compensation to one (1) or more Members at such times and in such amounts as shall be determined by the Managing Members in their reasonable discretion.

6.10    ***Tax Elections.***

(a)    The Members intend that the Company be taxable as a partnership for federal and state income tax purposes. The Managing Members shall cause to be filed with the appropriate tax authorities any elections or other documents necessary to give due legal effect to such a position. A Member shall not file any income tax election or other document that is inconsistent with the Company's position regarding its classification for applicable Federal, State and Local income tax purposes.

(b)    The Managing Members may determine, to the extent allowed by the Code and Regulations, that it is in the best interest of the Members or the Company to change its entity classification for federal and state income tax purposes. Each Member agrees to give written consent thereto in such form and manner and to execute all documents and take such other actions as may be necessary, convenient or advisable to effectuate such action.

(c)    ***Notice of Settlement Agreement***. Any Member entering into a settlement agreement with the United States Department of the Treasury which concerns a Company item shall notify the Managing Members of such settlement agreement and its terms within sixty (60) days after the date thereof.

6.11    ***Records and Financial Statements***.

(a)    The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company. The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Copies of such books, records, reports, accounts and schedules shall be located at the Principal Office, or at any location specified by the Managing Member, and shall be available to any Member for inspection and copying, upon at least two (2) business days' notice, during reasonable business hours.

(b)    Within ninety (90) days after the end of each Fiscal Year, the Company shall furnish to each Member a statement, which need not be audited, of: (i) the assets and liabilities of the Company, (ii) the net Profit or Loss of the Company, and (iii) the Capital Account balance of such Member. In addition, within ninety (90) days after the end of each Fiscal Year, the Company shall supply all information reasonably necessary to enable the Members to prepare their Federal income tax returns and (upon request therefor) to comply with other reporting requirements imposed by law.

6.12    ***Confidentiality***. The Members acknowledge and agree that all information provided to them by or on behalf of the Company or a Managing Member concerning the business or assets of the Company or any Member shall be deemed strictly confidential and shall not, without the prior consent of the Managing Members, be (i) disclosed to any Person (other than a Member) or (ii) used by a Member other than for a Company purpose or a purpose reasonably related to protecting such Member's Interest (in a manner not

ATF0958

inconsistent with the interests of the Company). The Managing Members hereby consent to the disclosure by each Member of Company information to such Member's accountants, attorneys and similar advisors bound by a duty of confidentiality; moreover, the foregoing requirements of this Section 6.12 shall not apply to a Member with regard to any information that is currently or becomes: (i) required to be disclosed pursuant to applicable law (but only to the extent of such requirement); (ii) required to be disclosed in order to protect such Member's Interest (but only to the extent of such requirement and only after consultation with the Managing Members); (iii) publicly known or available in the absence of any improper or unlawful action on the part of such Member; or (iv) known or available to such Member other than through or on behalf of the Company or a Managing Member. For purposes of this Section 6.12, Company information provided by one (1) Member to another shall be deemed to have been provided on behalf of the Company. Provided that the Company or a Managing Member may disclose any information to the extent necessary or advisable for the formation, operation, Dissolution, winding-up, or Termination of the Company (as determined by the Managing Members in their reasonable discretion), the Company and the Managing Members shall similarly refrain from disclosing any confidential information furnished by a Member pursuant to Section 6.13.

6.13    *Disclosures*.  Each Member shall furnish to the Company upon request any information with respect to such Member reasonably determined by the Managing Members to be necessary or convenient for the formation, operation, Dissolution, winding-up, or Termination of the Company.

6.14    *Valuation of Company Assets and Interests*.

(a)    *General*.  In the event that the fair market value of a Company asset or Interest must be determined for purposes of this Agreement, such value shall be determined by the Managing Members, acting in good faith. Within ninety (90) days after such determination, the Managing Members shall provide notice thereof to all the Members (a "Valuation Notice").

(b)    *Dispute*.  In the event that, within thirty (30) days after having been given a Valuation Notice, any Member (an "Objecting Member") provides notice to the Company asserting that the value set forth in such Valuation Notice is materially inaccurate due to manifest error (a "Dispute Notice"), the Managing Members and the Objecting Member shall undertake reasonable efforts to resolve their differences regarding such valuation through consultation and negotiation. In the event that the Managing Members and the Objecting Member agree upon a revised value, such revised value shall be set forth in a new Valuation Notice to all the Members. In the event that the Managing Members and the Objecting Member do not reach agreement within sixty (60) days after the date of the Dispute Notice, the Objecting Member may, by notice to the Company within thirty (30) days after the end of such sixty (60) day period, require that the matter be submitted to arbitration pursuant to Section 10.12; provided, however, that the arbitrator shall determine a value for the asset or Interest in question only if the arbitrator first determines that the value described in the Valuation Notice is materially inaccurate due to manifest error.

(c)    *Binding Effect*.  The value of any Company asset or Interest determined pursuant to this Section 6.14 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement. Unless and until such time as the value of an asset or Interest is determined pursuant to arbitration as described in Section 6.14(b), the value determined by the Managing Members pursuant to Section 6.14(a) and 6.14(b) shall be deemed the Fair Market Value of such asset or Interest.

ATF0959

# SECTION 7

## TRANSFERS AND WITHDRAWALS

7.1     *Restrictions on Transfers of Interests.*

(a)     A Member shall not Transfer all or any portion of its Interest without the prior consent of the Managing Members, which consent may be withheld in the Managing Members' sole and absolute discretion.

(b)     Unless admitted as a Member in accordance with the provisions of this Agreement, the transferee of all or any portion of an Interest shall not be a Member, but instead shall be subject to the provisions of Section 7.9.

7.2     *Transfers of Interests.*

(a)     In connection with each Transfer of an Interest:  (i) the transferor and transferee shall execute and deliver to the Company a written instrument of transfer in form and substance reasonably satisfactory to the Managing Members and (ii) the transferee shall execute and deliver to the Company a written instrument pursuant to which the transferee assumes all obligations of the transferor associated with the transferred Interest and otherwise agrees to comply with the terms and provisions of this Agreement.

(b)     In the event a Member Transfers (or proposes to Transfer) all or any portion of its Interest, all reasonable legal and other out-of-pocket expenses incurred by the Company on account of the Transfer (or proposed Transfer) shall be paid by such transferring Member.  Following the effective date of any Transfer, the transferor and transferee shall be jointly and severally liable for all such expenses.

(c)     Except as otherwise specifically provided in this Agreement or with the consent of the Managing Members, all economic attributes of a transferor Member's Interest (such as the Member's Capital Contribution, Allocation Percentage, Capital Account balance, and obligation to return distributions or make other payments to the Company) shall carry over to a transferee in proportion to the percentage of the Interest so transferred.

(d)     Notwithstanding any provision of this Agreement to the contrary, a Member or Withdrawn Member shall not, by virtue of having Transferred all or any portion of its Interest, be relieved of any obligations arising under this Agreement; provided, however, that a Member or Withdrawn Member shall be relieved of such obligations to the extent that: (i) such relief is approved by the Managing Members (which approval may be withheld by the Managing Members in their sole and absolute discretion); and (ii) such obligations are assumed by another Member or Person admitted to the Company as a Substitute Member.

(e)     In the event of any Transfer which results in multiple ownership of a Member's Interest, the Managing Members may require that one (1) or more trustees or nominees be designated to represent all or a portion of the Interest transferred for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement and for the purpose of exercising all rights of the transferees under this Agreement.

ATF0960

(f)     Once all other conditions to the Transfer of a Member's Interest have been satisfied, such Transfer shall be effective as of: (a) the Close of Business on the last day of the next ending fiscal quarter of the Company; or (b) such other time as shall be jointly selected by the Managing Members, the transferor and the transferee.

(g)     Notwithstanding any provision of this Agreement to the contrary, there shall be no Transfer of an Interest unless such Transfer will not: (i) give rise to a requirement that the Company register under the Securities Act; (ii) otherwise subject the Company, a Managing Member, or any equity holder, member, director, officer, or employee of a Managing Member to additional regulatory requirements under Federal, State, local or foreign law, compliance with which would subject the Company or such other Person to material expense or burden (unless each such affected Person consents to such Transfer); (iii) constitute a transaction effected through an "established securities market" within the meaning of Treasury Regulation Section 1.7704-1(b) or otherwise cause the Company to be a "publicly traded partnership" within the meaning of Section 7704 of the Code; (iv) effect a termination of the Company under Section 708 of the Code (but only if such termination would result in material adverse consequences to the Company or any Member under Federal, State or local law); or (v) violate any law, regulation or other governmental rule, or result in a violation thereof by the Company, a Managing Member, or any equityholder, member, director, officer, or employee of a Managing Member.

(h)     Any Transfer in violation of this Section 7: (i) shall be null and void as against the Company and the other Members; and (ii) shall not be recognized or permitted by, or duly reflected in the official books and records of, the Company. The preceding sentence shall not be applied to prevent the Company from enforcing any rights it may have in respect of a transferee arising under this Agreement or otherwise.

7.3     ***Permitted Transfers.*** Notwithstanding any other provision of this Agreement, each Member shall have the right to transfer all or any part of an Interest to one (1) or more of the persons whose names are set forth in Schedule A to this Agreement. Moreover, any Member may transfer all or part of his or her Interest to an inter vivos trust in which the transferring Member continues to maintain control of the transferred Interest as trustee of the trust. The trust agreement must provide that the Interest is subject to all of the provisions of this Agreement, and that the trustee may not transfer the Interest except as provided in this Agreement. A copy of the trust agreement, and any amendments to the trust agreement, must be delivered by the transferring Member to the Managing Members for review, and retained in Company's files. In all cases of a transfer pursuant to this Section 7.3, a permitted transferee shall hold the transferred Interest subject to all of the provisions of this Agreement.

7.4     ***Right of First Refusal:*** Notwithstanding the provisions of Section 7, each time a Member proposes to transfer all or any part of his or her Membership Interest other than pursuant to Sections 7.2 (b) and 7.3, such Member shall first offer such Membership Interest to the Company and the other Members in accordance with the following provisions:

(a)     The Selling Member shall deliver a written notice ("Option Notice") to the Company and the other Members stating (i) such member's bona fide intention to transfer such Membership Interest, (ii) the Membership Interest to be transferred, (iii) the purchase price and payment for which the Member proposes to transfer such Membership Interest and (iv) the name and address of the proposed transferee.

(b)     Within thirty (30) days after receipt of the Option Notice, the Company shall have the right, but not the obligation, to elect to purchase all or any part of the Selling Member's Membership Interest upon the price and terms of payment designated in the Option Notice. If the Company exercises such right

18

ATF0961

within the thirty (30) day period, the Managing Members shall give written notice of the fact to the selling Member.

(c)    If the Company fails to purchase the entire Membership Interest, the non-transferring Members shall have the right, but not the obligation, to elect to purchase any remaining share of such Membership Interest upon the price and terms of payment designated in the Option Notice. The non-transferring Member shall notify the selling member within sixty (60) days of after receipt of the Option Notice of his or her desire to purchase a portion of the Membership Interest.

(d)    If a Member or the Company elect to purchase the Interest, the Selling Member shall deliver at the closing an assignment of the Interest to be sold, with full warranties of title, in form and substance acceptable to the Company or purchasing Member.

(e)    If the Interest is not sold within sixty (60) days after the Option Notice, then all the provisions of this Agreement shall again become applicable and any Selling Member sell to the proposed transferee under the terms and price stated in the Option Notice within three (3) months after the expiration of the right of the Company and other Members and must comply with all terms and conditions of Section 7 with respect to any proposed transfer of an Interest. However, any transfer shall be void if it made at a lower price or on terms more favorable to the transferee than those specified in the Option Notice.

7.5    ***Purchase Obligations on Death.***  On the death of a Member ("deceased Member"), his or her estate shall sell to the other Members and/or the Company the Interest held by the deceased Member at death. The purchase and sales shall be made within thirty (30) days following the qualification of the deceased Member's executor or administrator, at the price and on the terms provided in this Agreement. The obligation of the other Members to purchase a deceased Member's Interest shall be several and not joint and shall be in proportion (excluding the Interest of the deceased Member) to their respective Allocation Percentage in the Company on the date of the deceased Member's death. Neither the deceased Member nor the estate of the deceased Member shall have any voting or other rights as a Member from and after the date of the death of the deceased Member, except the right to receive payment for the purchase of the Interest in accordance with this Agreement. The valuation date for the purpose of this Section 7.5 shall be the last day of the month preceding the month in which the deceased Member died.

7.6    ***Purchase Obligation on Total Disability.***  On the total disability of a Member ("disabled Member"), which persists for three (3) months and is likely, in the opinion of a physician mutually designated by the parties to this Agreement, to continue for the life (or other extended or undetermined period) of the Member, the disabled Member (or his/her personal representative) shall sell to the other Members and/or Company the Interest held by the disabled Member. The purchase and sale shall be made at the price and on the other terms that would have prevailed had the disabled Member died on the first anniversary of disability. The obligation of the other Members to purchase a disabled Member's Interest shall be several and not joint and shall be in proportion (excluding the Interest of the disabled Member) to their respective Allocation Percentage in the Company on the date the determination of total disability is made. The Disabled Member shall have no voting or other rights as a Member from and after the date it is determined that the Member is disabled and that the Interest will be purchased, except the right to receive payment for the purchase of such Interest in accordance with this Agreement. The valuation date for purposes of this Section 7.6 shall be the last day of the month preceding the month in which the determination of total disability is made.

7.7    ***Withdrawal/Removal of a Member.***  A Non-Managing Member shall not withdraw from the Company or otherwise cease to be a Member without the consent of the Managing Members, which consent may be withheld in the Managing Members' sole and absolute discretion. A Managing Member may

19

ATF0962

withdraw from the Company upon thirty (30) days' prior notice to the Company (or upon such shorter notice as is approved by the Managing Members).

      (a)    A Member may be required to withdraw as provided in Section 3.4. The Managing Members may also require the complete or partial withdrawal of a Non-Managing Member if the Managing Members determine in their reasonable discretion that continued undiminished membership of the Non-Managing Member in the Company would (i) constitute or give rise to a violation of applicable law or (ii) otherwise subject the Company or a Managing Member to material onerous legal, tax or other regulatory requirements that cannot reasonably be avoided without material adverse consequences to the Company or any other Member.

      (b)    A Member shall be deemed to have withdrawn with the consent of the Managing Members upon such Member's death or Permanent Incapacity. Except as otherwise determined by the Managing Members in their sole and absolute discretion, a Member shall be deemed to have withdrawn without the consent of the Managing Members upon such Member's Bankruptcy, Dissolution or Termination.

      (c)    Except as otherwise provided in this Section 7.7, a Member shall not be removed from the Company without its consent.

    7.8    ***Procedures Following Member Withdrawal/Removal.*** A Member that withdraws or is removed from the Company (including via a deemed withdrawal) in accordance with the provisions of Section 7.7 or otherwise ceases to be a member of the Company under the Act (each a "Withdrawal Event" and a "Withdrawn Member") shall be treated as an Assignee and, accordingly, shall have the rights and obligations of an Assignee as described in Section 7.9. Subject to the preceding sentence, a Withdrawn Member shall not be entitled to any redemption of its Interest, distribution or payment in connection with its Withdrawal Event or otherwise in consequence of its status as a Withdrawn Member.

    7.9    ***Status of Assignees.***

      (a)    Notwithstanding any provision of this Agreement to the contrary, an Assignee shall not be admitted to the Company as a Substitute Member without the consent of the Managing Members, which consent may be withheld in the Managing Members' sole and absolute discretion.

      (b)    All rights and privileges associated with an Assignee interest in the Company shall be derived solely from the Member interest of which such rights and privileges were previously a component part. No Assignee shall hold, by virtue of such Assignee's interest in the Company, any rights and privileges that were not specifically transferred to such Assignee by the prior holder of such interest. No Member, Assignee or other rights or privileges arising under this Agreement or the Act shall apply with respect to a notional or constructive interest in the Company, without regard to whether such interest constitutes a Derivative Company Interest.

      (c)    Subject to Section 4.1(c), an Assignee that holds an interest in the Company shall be entitled to receive the allocations attributable to such interest pursuant to Section 4, to receive the distributions attributable to such interest pursuant to Sections 5 and 8, and to Transfer such interest in accordance with the terms of this Section 7. Notwithstanding the preceding sentence, the Company and the Members shall incur no liability for allocations and distributions made in good faith to a transferor until a valid written instrument of Transfer has been received by the Company and recorded on its books and the effective time of the Transfer has passed.

ATF0963

(d)     To the extent otherwise applicable to the interest in the Company that has been transferred to an Assignee, the Assignee shall be subject to, and bound by, all of the terms and provisions of this Agreement that inure to the benefit of the Company or any Member (without regard to whether such Assignee has executed a written instrument of Transfer or an assumption of obligations as described in Section 7). Without limitation on the preceding sentence, an Assignee that holds an interest in the Company shall be responsible for any unpaid Capital Commitment and obligation to return distributions or make other payments to the Company associated with such interest and shall comply with the provisions of Sections 6.12, 6.13, and 10.12.

(e)     Solely to the extent necessary to give effect to the Assignee rights and obligations set forth in Section 7.9(c) and 7.9(d), an Assignee shall be treated as a Member for purposes of this Agreement.

(f)     An Assignee shall not, solely by virtue of its status as such, hold any non-economic rights in respect of the Company. Without limitation on the preceding sentence, an Assignee's interest in the Company shall not entitle such Assignee to participate in the management, control or operation of the Company or its business, act for the Company, bind the Company under agreements or arrangements with third parties, or vote on Company matters. An Assignee shall not have any right to receive or review Company books, records, reports or other information; provided, however, that an Assignee may, at its own expense, require that an independent public accounting firm of national standing in the United States review (not more than once per Fiscal Year) the Company's financial statements for purposes of determining that such Assignee has received from the Company all distributions to which it is entitled in respect of its economic interest in the Company. An Assignee shall not hold itself out as a Member in any forum or for any purpose; provided, however, that, to the extent necessary to maintain consistency with the Company's income tax returns, reports, and other filings, an Assignee shall take the position that it is a Member (or "partner") solely for income tax purposes. Notwithstanding the foregoing provisions of this Section 7.9(f), an Assignee shall have the amendment consent rights specified in Section 10.5(d).

(g)     Set forth below the name of each Assignee on Schedule A shall be appropriate contact information for such Assignee (including such Assignee's mailing address, telephone number, and facsimile number as well as, in the case of a Assignee that is an entity, the name or title of an individual to whom correspondence should be directed). Each Assignee shall promptly provide the Company with the information required to be set forth for such Assignee on Schedule A and shall thereafter promptly notify the Company of any change to such information.

ATF0964