UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EVERYTOWN FOR GUN SAFETY SUPPORT
FUND, THE CITY OF KANSAS CITY,
MISSOURI and THE STATE OF ILLINOIS,

                                    Plaintiffs,

              -against-

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES; and REGINA
LOMBARDO, in her official capacity as ACTING
DIRECTOR of Bureau of Alcohol, Tobacco,
Firearms and Explosives,

                                    Defendants.

---

No. 1:21-cv-00376-ALC

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PUBLIC REDACTED VERSION

# TABLE OF CONTENTS

Page

Table of Authorities ............................................................................................. ii

Preliminary Statement ...........................................................................................1

Statutory and Regulatory Background ...................................................................2

Legal Standard ......................................................................................................4

Statement of Undisputed Facts .............................................................................5

I.   Paul Jimenez founded and operated Jimenez Arms with the involvement
     of Bruce Jennings and members of the Jennings family ..........................................5

II.  Jimenez Arms unlawfully sold firearms to a Kansas City gun trafficker. ...............9

III. Jimenez Arms repeatedly violated federal recordkeeping requirements. .............11

IV.  After Jimenez Arms declared bankruptcy, ATF promptly issued a license
     to Jimenez's new gun business, JA Industries. ......................................................13

V.   Plaintiffs were harmed, and will continue to be harmed, by ATF's
     decision. ...............................................................................................................13

Argument ............................................................................................................14

I.   ATF's issuance of a license to JA Industries was contrary to law .........................15

     A.   ATF is required to deny a license to an applicant who is not
          "qualified." ...................................................................................................15

     B.   Jimenez was not qualified to receive a license. ...........................................16

          i.    Jimenez's false statements and omissions about the
                Jennings family's involvement in Jimenez Arms disqualify
                him from receiving an FFL. .....................................................................16

          ii.   Jimenez violated the GCA in Jimenez Arms' sales to James
                Samuels. .................................................................................................18

II.  ATF's issuance of a license to JA Industries was arbitrary and capricious. ...........19

     A.   ATF is required to diligently investigate whether an applicant is
          qualified. .......................................................................................................19

     B.   ATF failed to adequately investigate JA Industries. .....................................20

          i.    ATF ignored its own materials detailing concerns about
                granting Jimenez a license. .....................................................................20

          ii.   ATF failed to consider Jimenez Arms' facilitation of
                criminal activity, despite its clear relevance. .........................................23

          iii.  ATF ignored agency procedures in reviewing JA
                Industries' application. ...........................................................................24

Conclusion ..........................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al's Jewelry & Loan, Inc. v. U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms*,
No. 95–1765, 1996 WL 683528 (6th Cir. Nov. 22, 1996)..........................................15

*Armament Servs. Int'l v. Att'y Gen.*,
No. 18-01125, 760 F. App'x. 114 (3d Cir. Jan. 22, 2019)..........................................18

*Arwady Hand Trucks Sales, Inc. v. Vander Werf*,
507 F. Supp. 2d 754 (S.D. Tex. 2007) ......................................................................15

*Barany v. Haelst*,
No. CV-09-253-RMP, 2010 WL 5071053 (E.D. Wash. Dec. 6, 2010)......................15

*Casanova Guns, Inc. v. Connally*,
454 F.2d 1320 (7th Cir. 1972) ..................................................................................15

*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
537 U.S. 293 (2003).............................................................................................4, 18

*Gossard v. Fronczak*,
206 F. Supp. 3d 1053 (D. Md. 2016) ..........................................................................3

*Jennings v. Mukasey*,
511 F.3d 894 (9th Cir. 2007) ......................................................................................6

*Lewin v. Blumenthal*,
590 F.2d 268 (8th Cir. 1979) ....................................................................................16

*MEW Sporting Goods, LLC v. Johansen*,
992 F. Supp. 2d 665 (N.D. W. Va. 2014) ..................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).......................................................................................4, 23, 24

*Nat. Res. Def. Council, Inc. v. EPA*,
438 F. Supp. 3d 220 (S.D.N.Y. 2020).......................................................................25

*Nat'l Coal. to Ban Handguns v. Bureau of Alcohol, Tobacco & Firearms*,
715 F.2d 632 (D.C. Cir. 1983) (Scalia, J.) ................................................................15

*New York v. U.S. Dep't of Commerce*,
351 F. Supp. 3d 502 (S.D.N.Y.), *aff'd in relevant part*, 139 S. Ct. 2551 (2019) ..........5

*New York v. U.S. Dep't of Health & Human Servs.*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ........................................................4

*Roberts v. United States*,
   883 F. Supp. 2d 56 (D.D.C. 2012), *aff'd*, 741 F.3d 152 (D.C. Cir. 2014) ....................5

*Sierra Club v. Babbitt*,
   15 F. Supp. 2d 1274 (S.D. Ala. 1998) ........................................................25

*Stein's, Inc. v. Blumenthal*,
   649 F.2d 463 (7th Cir. 1980) ........................................................15

*Sturdy v. U.S. Dep't of Justice*,
   No. 10-CV-00368, 2011 WL 4407444 (E.D. Mo. Sept. 21, 2011) ........................16, 21

*Town of Barnstable v. FAA*,
   659 F.3d 28 (D.C. Cir. 2011) ........................................................25

*Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   348 F. Supp. 2d 1299 (S.D. Ala. 2004) ........................................................24

*XVP Sports, LLC v. Bangs*,
   No. 11-CV-00379, 2012 WL 4329258 (E.D. Va. Sept. 17, 2012) ........................3

**Statutes & Rules**

5 U.S.C. § 706(2)(A) ........................................................4

18 U.S.C. § 2 ........................................................18

18 U.S.C. § 922(a) ........................................................18, 19

18 U.S.C. § 922(b) ........................................................18

18 U.S.C. § 922(g) ........................................................3

18 U.S.C. § 922(t) ........................................................18

18 U.S.C. § 923(c) ........................................................3, 15

18 U.S.C. § 923(d) ........................................................passim

18 U.S.C. § 924(a) ........................................................16

Administrative Procedure Act ........................................................passim

Gun Control Act of 1968 ........................................................passim

Pub. L. No. 90-618, 82 Stat. 1213 ........................................................2

**Other Authorities**

27 C.F.R. § 478.52 ................................................................................10

27 C.F.R. § 478.39 ..............................................................................11, 12

27 C.F.R. § 478.47 ............................................................................4, 15, 19

27 C.F.R. § 478.71 ................................................................................19

27 C.F.R. § 478.122 ..............................................................................11

27 C.F.R. § 478.123 ...........................................................................11, 12

S. Rep. No. 90-1501 (Sept. 6, 1968) ................................................................2

# PRELIMINARY STATEMENT

In April 2020, Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") issued a federal firearms license ("FFL") to JA Industries, a company owned and operated by a gun manufacturer named Paul Jimenez ("Jimenez"). JA Industries' license application was not ATF's first encounter with Jimenez, who ATF knew had been consistently violating federal firearms laws and regulations for nearly two decades. If ATF's earlier encounters with Jimenez had taught the agency anything, it was that Jimenez could not be trusted to operate a legal, safe, and responsible gun business. Nonetheless, after less than a month of "investigation," ATF gave Jimenez permission to continue manufacturing and selling firearms. The decision to grant Jimenez an FFL was arbitrary, capricious, and contrary to law, and must be set aside under the Administrative Procedure Act ("APA").

Jimenez's track record should have spoken for itself. Between 2004 and 2020, Jimenez sold his guns through a company called "Jimenez Arms." Under that business name, Jimenez committed numerous willful violations of the Gun Control Act ("GCA") and its implementing regulations, including by lying to ATF about whether an individual legally prohibited from being involved in a firearms business was controlling Jimenez Arms, failing to maintain records adequate to account for lost or stolen weapons, and shipping handguns to an unlicensed buyer despite overwhelming evidence that such shipments were illegal.

In February 2020—mired in tax liability and days after losing a motion to dismiss in a wrongful death lawsuit stemming from its sales to a Kansas City arms trafficker—Jimenez Arms filed for bankruptcy. Though Jimenez dissolved his liability-laden company, he had no intention of ending his illegal and irresponsible behavior. Less than six weeks after seeking bankruptcy protection for Jimenez Arms, Jimenez resurrected his gun business under the name "JA Industries," a carbon copy of Jimenez Arms that makes the same guns, in the same town, using the

1

same supplier, and under the same management as its predecessor.

Despite Jimenez's history of open and notorious unlawful behavior, when Jimenez applied for a new license for JA Industries, ATF granted the application in just 28 days—on an incomplete record and in blatant disregard of concerns that ATF itself had documented about Jimenez for years. In so doing, ATF violated the APA in two independent ways. *First*, Jimenez's willful and repeated violations of the GCA rendered him unqualified to receive a license and required ATF to deny his application. Because ATF issued an FFL to an unqualified applicant, its decision was contrary to law. *Second*, ATF granted JA Industries' application after conducting a cursory investigation that neglected to follow obvious leads, cut procedural corners, and entirely overlooked information relevant to determining whether Jimenez was qualified to receive a license. ATF's deficient review of the evidence before it—and failure to consider additional, publicly available evidence that was easily within ATF's reach—rendered its decision to grant Jimenez's application arbitrary and capricious. By issuing JA Industries an FFL, ATF harmed and continues to harm the Plaintiffs and failed its obligation to protect the public. The Court should set aside ATF's decision.

## STATUTORY AND REGULATORY BACKGROUND

Congress enacted the GCA with the principal purpose of "provid[ing] support to Federal, State and local law enforcement officials in their fight against crime and violence." Pub. L. No. 90-618, 82 Stat. 1213 (1968). The licensing provisions of the GCA in particular were meant to "prescribe meaningful licensing standards and denial hearing procedures designed to assure that licenses would be issued only to responsible, law-abiding persons actually engaged in, or intending to engage in, business as importers, manufacturers, or dealers in firearms or ammunition." S. Rep. No. 90-1501, at 25 (Sept. 6, 1968). To effectuate that goal, Congress "set forth specific standards . . . to obtain Federal licenses." *Id.*

The licensing provisions of the GCA provide criteria for issuing an FFL to a "qualified applicant." 18 U.S.C. § 923(c). In order to be "qualified," an applicant must: (1) be 21 years of age or older; (2) have a business premises; (3) certify that the business can operate in compliance with state and local laws; and (4) certify that secure gun storage or safety devices will be available at any place the applicant sells firearms. *Id.* § 923(d)(1)(A), (E)–(G). The applicant must *not*: (1) be prohibited from transporting, shipping or receiving firearms or ammunition;[1] (2) have "willfully violated any of the provisions" of the GCA or its implementing regulations; or (3) have "willfully failed to disclose any material information required," or "made any false statement as to any material fact, in connection with his application." *Id.* § 923(d)(1)(B), (C), (D). ATF is required to deny the license application of any unqualified applicant.

ATF is also required to deny a license application when any of the business's "responsible persons" is prohibited from possessing firearms. *See id.* § 923(d)(1)(B). A "responsible person" in this context is an individual who "possess[es], directly or indirectly, the power to direct or cause the direction of the management and policies" of the business. *Id.*; *see also* ATF E-Form 7 (5310.12)/7CR(5310.16) (Rev. Apr. 2019). An applicant is required to name each "responsible person" on the application and to certify that the application and supporting documents "to the best of [the applicant's] knowledge and belief, . . . are true, correct, and complete." ATF E Form 7. Willfully failing to list a responsible person on an FFL application constitutes a material failure to disclose information that warrants an application denial. *See Gossard v. Fronczak*, 206 F. Supp. 3d 1053, 1064–65 (D. Md. 2016); *XVP Sports, LLC v. Bangs*, No. 11-CV-00379, 2012 WL 4329258, at *7–9 (E.D. Va. Sept. 17, 2012).

---

[1] Certain criminal convictions, including felonies and certain domestic violence misdemeanors, prohibit individuals from engaging in these activities. 18 U.S.C. § 922(g).

ATF implemented Congress' mandatory licensing criteria by directing its National Licensing Center to issue an FFL only after it "find[s] through further inquiry or investigation, or otherwise, that the applicant is qualified." 27 C.F.R. § 478.47(a). ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

## LEGAL STANDARD

The APA requires federal courts to "hold unlawful and set aside agency action found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is "not in accordance with law" when it is contrary to a relevant statute or other applicable law. *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003). An agency action is "arbitrary and capricious" when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

When "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal, and the entire case on review is a question of law." *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (cleaned up). On summary

judgment, "[a]fter the agency resolves factual issues and develops the administrative record, the district court 'determine[s] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* at 517 (alteration in original) (quoting *Roberts v. United States*, 883 F. Supp. 2d 56, 62 (D.D.C. 2012), *aff'd*, 741 F.3d 152 (D.C. Cir. 2014)).

"[J]udicial review of administrative action is generally 'based on the full administrative record that was before the [agency decisionmaker] at the time he made his decision.'" *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 630 (S.D.N.Y.) (citation omitted), *aff'd in relevant part*, 139 S. Ct. 2551, 2574 (2019). "[T]he 'whole administrative record' mandated by the APA consists of all documents and materials directly or indirectly considered by agency decision-makers, including 'evidence contrary to the agency's position.'" *Id.* at 632 (citations omitted). In addition to the administrative record, a reviewing court may consider evidence outside the record "to illuminate a complex record and to help the court better understand the issues involved" as well as "to evaluate whether an agency failed to consider all relevant factors, ignored an important aspect of the problem, or deviated from established agency practices." *Id.* at 633.

## STATEMENT OF UNDISPUTED FACTS[2]

### I. Paul Jimenez founded and operated Jimenez Arms with the involvement of Bruce Jennings and members of the Jennings family.

From 1985 to 2003, Paul Jimenez worked for Bryco Arms ("Bryco"), one of the so-called "ring of fire" manufacturers in the greater Los Angeles area that manufactured cheap, low-quality pistols that turned up disproportionately at crime scenes. (Pls.' Rule 56.1 Statement ("Pls' 56.1")

---

[2] The following facts are taken from (1) the administrative record on which ATF based its decision to grant JA Industries a license and (2) public or agency documents that provide background information and fill gaps in the administrative record compiled by ATF. *See New York v. Dep't of Commerce*, 351 F. Supp. 3d at 633.

¶ 18.)  On paper, Bryco was owned and operated by Janice Jennings, Bruce Jennings' ex-wife. (*Id.* ¶ 21.)  In reality, Bryco was illegally controlled by Bruce Jennings (*id.* ¶¶ 22–23), who since 1996 has been prohibited from running a firearms business due to a domestic violence conviction, *see Jennings v. Mukasey*, 511 F.3d 894, 896–97 (9th Cir. 2007).[3]  While Bryco had long drawn ATF's interest due to Bruce Jennings' hidden involvement, it ultimately filed for bankruptcy in 2003.  (*Id.* ¶¶ 21–24.)  In the bankruptcy process, Jimenez proposed to purchase Bryco's assets in order to start Jimenez Arms.  (*Id.* ¶¶ 25–26.)  In September 2003, Jimenez applied for an FFL for Jimenez Arms, which was to be based in Costa Mesa, California.  (*Id.* ¶¶ 27–28.)  On the application, Jimenez certified under penalty of law that he would be Jimenez Arms' sole responsible person.  (*Id.* ¶ 29.)

As part of the application process, ATF interviewed Jimenez three times in person over the course of six months.  (*Id.* ¶ 30.)  During a January 2004 interview, Jimenez told ATF that he was the sole investor in Jimenez Arms, that he would not have any paid consultants, and that neither Bruce Jennings nor any member of the Jennings family would have "any role" in the company. (*Id.* ¶ 31.)  When ATF interviewed Jimenez again in June 2004, however, Bruce Jennings attended the interview and participated actively on Jimenez's behalf, at one point threatening to sue ATF over the delay in granting Jimenez Arms a license.  (*Id.* ¶ 33.)  Jennings also asserted during the interview that "ATF was costing him $1,000 a day in expenses for Bryco, for not processing Mr. Jimenez's application in a timely manner."  (*Id.* ¶ 34.)  ATF ultimately issued the license in July 2004 (*id.* ¶ 35), but the record here contains no explanation for that decision.  Moreover, in August

---

[3] According to ATF records, Bruce Jennings admitted that he was actually running Bryco when that company filed for bankruptcy in 2003 (Pls.' 56.1 ¶ 22), and the ATF declaration filed in this case seems to confirm that conclusion (*id.* ("Bryco Arms . . . was operated by Bruce Jennings . . . .")).  Since 2013, Jennings has also been prohibited from holding an FFL due to a felony conviction for possession and distribution of child pornography. (*Id.* ¶ 21.)

2004, as part of a criminal investigation into Bryco for suspected hidden ownership by Jennings, ATF noted that "[i]t is also believed that Paul Jimenez is working for Bruce Jennings." (*Id.* ¶ 23.)

In early 2005, Jimenez told an ATF Area Supervisor that he might be relocating from California to Nevada. (*Id.* ¶ 39.) The Supervisor emailed ATF's National Licensing Center on February 1, 2005, stating "IF you receive a change of address application from this guy… please send it to me for inspection. We have some concerns." (*Id.* ¶ 36.) The next day, Jimenez submitted an application to change Jimenez Arms' address to one in Nevada. (*Id.* ¶ 38.) On August 5, 2005, Jimenez called the ATF Area Supervisor again and told him that he was withdrawing his change of address application, but that he would form a corporation and open a new business in Nevada. (*Id.* ¶ 39.)

On August 10, 2005, Jimenez Arms, Inc., with Jimenez listed as the president and sole responsible person, applied for a license to operate in Henderson, Nevada. (*Id.* ¶ 40.) Once again, Jimenez certified that every statement in his application was true. (*Id.* ¶ 41.) Internal ATF emails discussing the 2005 application show that ATF officials still had concerns about Jennings' continuing involvement with Jimenez's business. (*Id.* ¶¶ 42–44.) The Area Supervisor had Jimenez sign a statement "under penalty of perjury" that he was "the sole shareholder for Jimenez Arms Inc." (*Id.* ¶ 42.) When the Area Supervisor asked ATF officials whether he could "approve [the application] and move on," the Director of Industry Operations at the Los Angeles Field Office responded with a one-word email: "NO!" (*Id.* ¶¶ 42–43.) This email exchange operated to "put a hold on the issuance or approval of [the] application." (*Id.* ¶ 45.) Another ATF official was concerned that "[Bruce] Jennings could be controlling Jimenez Arms" even after Jimenez gave a signed statement saying he was the sole shareholder for Jimenez Arms, because Jennings could control Jimenez without being a shareholder and Jimenez Arms could be "a front." (*Id.* ¶ 44.) The

official recommended "draft[ing] a broader statement that really covers the bases" for Jimenez to sign regarding Bruce Jennings' control over Jimenez Arms. (*Id.*) The official also offered her assessment of Jimenez's qualifications for a license: "As I've said, we have plenty of reason to hold and eventually deny the license." (*Id.*)

Notwithstanding these concerns, in July 2006, the Director of Industry Operations of the Los Angeles Field Office stated that it was "OK to approve th[e] application," and the application was approved. (*Id.* ¶ 46.) Nothing in the record, however, explains why ATF lifted its hold on Jimenez's application or decided to set aside the issues its personnel had raised.

In January 2008—a mere 18 months after Jimenez Arms' application had been approved—ATF's fears about the Jennings family's involvement in Jimenez's business began to come true. On January 17, 2008, Jimenez notified ATF that trusts in Jennings' children's names—Bradley A. Jennings and Kimberly K. Jennings—were taking ownership of more than 10% of Jimenez Arms. (*Id.* ¶ 50.) In March 2008, the ATF Acting Area Supervisor instructed inspectors to get "clarification regarding the percentage of stock sold to each trust[.]" (*Id.* ¶ 51.) The inspection determined that the Jennings children's trusts together took a two-thirds ownership in Jimenez Arms, and that Jimenez was now a minority owner in his own company. (*Id.* ¶ 52.) The same inspection noted that Jimenez Arms' exclusive distributor was Shining Star Investments, an FFL owned by Janice Jennings. (*Id.* ¶ 53.) Court filings in a lawsuit between Bruce Jennings and ATF show that around the same time, Jimenez hired Bruce Jennings as an "independent consultant" for Jimenez Arms, even though Jennings was prohibited from possessing firearms or controlling a gun company either directly or indirectly. (*Id.* ¶ 54.) In May 2008, ATF delivered a letter to Jimenez warning him that he faced potential prosecution over Jennings' involvement in Jimenez Arms. (*Id.* ¶ 55.)

Jimenez did not hide the Jennings family's involvement in and control of his business. In public filings in 2016, Jimenez represented that he had used "loans from distributorships owned by members of the Jennings family" to help start Jimenez Arms and that Bruce Jennings invested in the business "via personal loans" between 2006 and 2007. (*Id.* ¶ 57.) In the same lawsuit, Jimenez stated that he had "entered into an oral agreement" with Jennings in 2007 to have trusts created by Bruce Jennings in his children's names take two-thirds ownership of Jimenez Arms. (*Id.* ¶ 58.) Jimenez also represented that in 2013, he paid $1 million for the assets of a Florida firearms company owned by Bruce Jennings' then-wife. (*Id.* ¶ 59.) In 2015, Kimberly Jennings even contacted ATF to attempt to add herself as a responsible person for Jimenez Arms' license. (*Id.* ¶ 56.) In sum, though Jimenez repeatedly certified that he was the only person with the power to influence his gun company's operations the record before ATF and public court filings establish that members of the Jennings family loaned Jimenez money to found Jimenez Arms, served as the company's sole distributor, acted as its "independent consultant," and ultimately took a two-thirds ownership interest in the business.

## II. Jimenez Arms unlawfully sold firearms to a Kansas City gun trafficker.

Court filings in a criminal prosecution based on an ATF investigation show that Jimenez Arms repeatedly and willfully violated federal firearms regulations when it came to distributing firearms as well. Although Jimenez had been working in the gun industry for decades and had signed numerous forms acknowledging his familiarity with the federal laws governing the manufacture and sale of firearms (*id.* ¶ 49), Jimenez Arms repeatedly sold firearms directly to an unlicensed individual without completing a background check. These actions violated the GCA, which Jimenez surely knew. What's more, ATF knew that Jimenez had repeatedly sold firearms to an unlicensed individual, in violation of the GCA and the terms of Jimenez Arms' license, when ATF granted the license at issue in this case.

In January 2011, two ATF Industry Operations Investigators ("IOI") visited Jimenez Arms at the request of ATF's Kansas City Field Office to inquire into an order that "may have been placed by a possible firearms trafficker." (*Id.* ¶ 60.) One of the IOIs advised Jimenez Arms that when that individual "or an FFL in the Kansas City area places an order," the company should contact the ATF Las Vegas Field Office. (*Id.* ¶¶ 61–62.)

That request went unheeded:  on November 22, 2013, an unlicensed individual from Kansas City named James Samuels ("Samuels") telephoned Jimenez Arms. He stated "that he purchased Jimenez pistols at a gun show and wished to purchase directly thru the company." (*Id.* ¶ 63.) Samuels claimed that he "worked part time" at a local licensed dealer—even though that fact has no bearing on whether an individual can lawfully purchase guns directly from a manufacturer (they cannot). (*Id.* ¶ 65.) Samuels placed several orders over the months that followed, having the guns shipped to a Kansas City dealer called Conceal & Carry. (*Id.* ¶ 66.) By January 28, 2015, Samuels began asking Jimenez Arms instead to ship firearms directly to his home, misrepresenting that Conceal & Carry had a new address. (*Id.*) A new address would have required Conceal & Carry to obtain an amended license from ATF, 27 C.F.R. § 478.52, but Jimenez Arms failed to confirm with the agency that this new address was in fact associated with Conceal & Carry as Samuels claimed. Indeed, Jimenez Arms represented to ATF around the same time that it used ATF's "EZ Check" tool to verify the validity of a license prior to making a shipment (Pls.' 56.1 ¶ 67), but Samuels' home address was not associated with any license, indicating either that Jimenez Arms departed from its regular course of action in taking Samuels' order, or that Jimenez Arms knew that Samuels was unlicensed. Jimenez Arms shipped a total of 11 guns directly to Samuels' home. (*Id.*)

When Conceal & Carry closed in 2015, Samuels began using another licensed business in

the Kansas City area to take receipt of the guns he purchased. When Jimenez Arms contacted that business, an employee revealed "that Samuels *already had buyers for the firearms*," clearly indicating that Samuels was trafficking the guns. (*Id.* ¶¶ 69–70 (emphasis added).) Despite this obvious signal of illegality, Jimenez Arms proceeded to ship the guns to Samuels. One of the gun store's employees discovered the order and intervened, preventing Samuels from actually taking possession of the guns and returning the box to Jimenez Arms. (*Id.* ¶¶ 72–73.)

Ultimately, Samuels pled guilty to six counts of violating federal firearms law in connection with his illegal purchase and sale of 77 firearms, 57 of which were pistols manufactured and sold by Jimenez Arms. (*Id.* ¶¶ 75–76.) Samuels purchased at least 29 of these pistols directly from Jimenez Arms. (*Id.* ¶ 77.)

### III. Jimenez Arms repeatedly violated federal recordkeeping requirements.

To guard against gun trafficking and facilitate law enforcement's efforts to trace firearms used in crimes, regulations enacted pursuant to the GCA require federal licensees to keep diligent records related to the acquisition and disposition of firearms. *See* 27 C.F.R. §§ 478.122(a)(3), 478.123(a), (b). Similarly, the regulations require manufacturers to report when firearms are stolen or lost. *Id.* § 478.39a.

In a 2012 facility inspection, ATF found that Jimenez had violated each of these important anti-trafficking provisions. (Pls.' 56.1 ¶ 82.) Specifically, ATF's report identified *4 instances* in which Jimenez Arms failed to report the loss of a firearm, *57 instances* in which Jimenez Arms failed to record the disposition of a firearm, and *674 instances* in which Jimenez Arms failed to record acquisition information of firearms received for repair. (*Id.* ¶ 79.) ATF further identified a staggering *16,269 instances* in which Jimenez Arms had failed to record the acquisition and disposition of firearms that were purportedly sent to another licensee to have finishes applied. (*Id.* ¶ 80.) For the period covered by the inspection, Jimenez Arms acquired approximately 32,000

firearms (*id.* ¶ 81), meaning that in 2011 and 2012, Jimenez failed to keep accurate track of *more than half of his new inventory*.

Accordingly, during the 2012 inspection, ATF cited Jimenez Arms for failure to maintain acquisition and disposition records, failure to timely record the acquisition of firearms, failure to timely record the disposition of firearms, and failure to report the theft or loss of firearms to ATF and local law enforcement, in violation of 27 C.F.R. § 478.22(a)(3), 27 C.F.R. § 478.123(a), 27 C.F.R. § 478.123(b), and 27 C.F.R. § 478.39a. (*Id.* ¶ 82.) In light of the long list of violations, ATF held a warning conference with Jimenez at its offices in Las Vegas. (*Id.* ¶ 83.) Following the conference, ATF informed Jimenez that "future violations repeat or otherwise, could be viewed as willful and may result in the revocation of your license." (*Id.* ¶ 84.) ATF also noted to Jimenez that "[t]he violations for which you were cited could adversely impact ATF's ability to reduce violent crime and protect the public." (*Id.* ¶ 85.)

The effect of these warnings was minor and short-lived. Though Jimenez Arms technically passed its 2014 inspection (*id.* ¶ 86), the investigator noted that Jimenez Arms still "does not have any written internal controls in maintaining accurate records of acquisitions and dispositions of firearms" (*id.* ¶ 87). By the next inspection, Jimenez again had fallen out of compliance. In 2017, ATF cited Jimenez Arms again—this time for failure to timely record the acquisition of a firearm and failure to timely record the disposition of a firearm, in violation of 27 C.F.R. § 478.123(a) and 27 C.F.R. § 478.123(b). (*Id.* ¶¶ 88–89.) ATF's inspection report noted 456 discrepancies between the company's inventory and its records. (*Id.* ¶ 90.) ATF issued a warning letter, in which it expressed "particular concern" that Jimenez was unable to account for "missing firearms." (*Id.* ¶ 91.) As ATF noted in its 2017 letter, "When firearms are reported missing, the ability to trace these firearms is eliminated." (*Id.*)

**IV. After Jimenez Arms declared bankruptcy, ATF promptly issued a license to Jimenez's new gun business, JA Industries.**

In February 2020, Jimenez Arms filed for bankruptcy. (*Id.* ¶ 92.) The company had extensive debts, but the timing of the filing—less than a week after losing a motion to dismiss in a wrongful death lawsuit and only a month after having been sued by the City of Kansas City, Missouri for, *inter alia*, creating a public nuisance and abetting a gun trafficking ring through its sales to James Samuels (*id.* ¶¶ 93–94)—suggested that the company sought to escape liability for its tortious actions.[4]

One month after filing for bankruptcy, in March 2020, Jimenez applied for a license for JA Industries, LLC. (*Id.* ¶ 95.) Like Jimenez Arms, JA Industries is a firearms manufacturing company with a business address in Henderson, Nevada. (*Id.* ¶ 97.) In his application, Jimenez disclosed that he had previously held an FFL and listed the FFL number for Jimenez Arms. (*Id.* ¶ 98.) In April 2020, ATF conducted a single telephonic inspection of JA Industries, reportedly found "no issues" and granted the application. (*Id.* ¶¶ 99–100.)

New license in hand, JA Industries continues manufacturing the same guns as Jimenez Arms and, in all but name, operates as the same company. As one firearms dealer posted on its website following JA Industries' launch, "Jimenez Arms is back!! The new company, JA Industries LLC, will start shipping firearms in the coming weeks, starting with the JA Nine and the JA 380." (*Id.* ¶ 103.) The dealer confirmed that "JA Industries WILL honor the Jimenez Arms lifetime warranty." (*Id.* ¶ 104.)

**V. Plaintiffs were harmed, and will continue to be harmed, by ATF's decision.**

ATF's decision to license JA Industries in April 2020 has harmed, and continues to harm

---

[4] Among Jimenez Arms' debts was well over a million dollars in unpaid taxes owed to federal and state authorities. (Pls.' 56.1 ¶ 93.)

Plaintiffs Kansas City and Illinois, which both have a strong proprietary interest in protecting their citizens from gun violence and expend significant time and financial resources to do so. (*Id.* ¶¶ 6–7, 9.) Nevertheless, Jimenez-manufactured guns continue to turn up at crime scenes in Illinois, despite a law prohibiting their sale there, and they are regularly recovered from crime scenes in Kansas City. (*Id.* ¶¶ 8–9.) ATF's decision to re-license Jimenez undermines Illinois' and Kansas City's abilities to protect their citizens and to enforce their firearms laws and regulations. Setting ATF's decision aside will end the ongoing threat posed by firearms that are irresponsibly and illegally distributed by Jimenez.

ATF's decision has likewise harmed Plaintiff Everytown for Gun Safety Support Fund ("Everytown"), which has diverted resources from its general operations by taking unprecedented measures to limit the harm from Jimenez's firearms manufacturing businesses. (*Id.* ¶¶ 3–5.) To date, those steps have included bidding on and purchasing Jimenez Arms' inventory in a bankruptcy auction—and subsequently expending a substantial sum to destroy that inventory legally and safely—to try to prevent Jimenez from being able to use low-cost inventory to get JA Industries up and running. (*Id.* ¶ 4.) Setting aside ATF's licensing decision would allow Everytown to direct its resources back to its regular work, which includes gun violence prevention research, public education, and advocacy initiatives. (*Id.* ¶ 3.)

## ARGUMENT

ATF's decision to grant an FFL to Jimenez for JA Industries violated the APA in two ways. *First*, ATF's action was contrary to law because Jimenez did not meet the GCA's mandatory licensing criteria. *Second*, ATF's action was arbitrary and capricious because ATF failed to undertake the minimum process required by the GCA, its regulations, and ATF internal procedures to determine whether JA Industries was qualified to receive an FFL.

# I.   ATF's issuance of a license to JA Industries was contrary to law.

## A.   ATF is required to deny a license to an applicant who is not "qualified."

The GCA requires ATF to issue an FFL to an applicant who submits an application, pays a fee, and is a "qualified applicant."  18 U.S.C. § 923(c); *see also* 27 C.F.R. § 478.47.  A "qualified applicant" is one who meets the licensing criteria prescribed by 18 U.S.C. § 923(d).  *See Al's Jewelry & Loan, Inc. v. U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms*, No. 95–1765, 1996 WL 683528, at *3 (6th Cir. Nov. 22, 1996) ("[T]he mention of 'qualified' in the statute is 'an apparent reference to the qualifications set forth in § 923(d)(1).'" (quoting *Nat'l Coal. to Ban Handguns v. Bureau of Alcohol, Tobacco & Firearms*, 715 F.2d 632, 637 (D.C. Cir. 1983) (Scalia, J.))).  Inversely, if an applicant does not meet one of those criteria—if, for example, he has willfully violated the GCA, or has made a false statement in connection with an application—he is not "qualified," and ATF must deny the application.  *See Casanova Guns, Inc. v. Connally*, 454 F.2d 1320, 1322 (7th Cir. 1972) ("The [GCA] explicitly prohibits the issuance of a license to a convicted felon . . . ." ); *Arwady Hand Trucks Sales, Inc. v. Vander Werf*, 507 F. Supp. 2d 754, 761 (S.D. Tex. 2007) ("As specified by statute, an application for a federal firearms license will not be approved if the applicant has willfully violated any provision of the chapter.").

A licensee has "willfully violated" the GCA within the meaning of 18 U.S.C. § 923(d)(1)(C) if the licensee knew of or was "plainly indifferent" to his obligations under the GCA or its implementing regulations and nevertheless committed the violation.[5]  *See Stein's, Inc. v. Blumenthal*, 649 F.2d 463, 467 (7th Cir. 1980).  Even a licensee whose conduct

---

[5] Willful violations committed by a licensed business are attributable to the business's responsible person.  *See Gilbert v. Bangs*, 481 F. App'x 52, 54–55 (4th Cir. 2012) (affirming decision upholding ATF's denial of a federal firearms license to an individual in his personal capacity due to violations committed while acting as the chief responsible person for a licensed business); *Barany v. Haelst*, No. CV-09-253, 2010 WL 5071053, at *7 (E.D. Wash. Dec. 6, 2010) (holding that willful GCA violations of the former corporate licensee were attributable to the individual who ran the business), *aff'd*, 459 F. App'x 587 (9th Cir. 2011).

merely shows "indifferen[ce] to the requirements of the law" commits a willful violation that justifies denial. *Lewin v. Blumenthal*, 590 F.2d 268, 269 (8th Cir. 1979). Once committed, a willful violation is permanently disqualifying; there is "no statute of limitations or other authority limiting the time period within which the [ATF] may consider violations of the [GCA] in its review of an application for a federal firearms license." *Sturdy v. U.S. Dep't of Justice*, No. 10-CV-00368, 2011 WL 4407444, at *6 (E.D. Mo. Sept. 21, 2011).

**B.** **Jimenez was not qualified to receive a license.**

There are two independent grounds on which to hold that ATF's decision to grant Jimenez a license for JA Industries was contrary to law. *First*, the record documents Jimenez's material false statements to ATF about Bruce Jennings' and his family's involvement in Jimenez Arms. These material misrepresentations disqualified Jimenez from receiving a license under 18 U.S.C. § 923(d)(1)(D). *Second*, Jimenez Arms' direct and illegal sales to a Kansas City gun trafficker violated the GCA and its regulations, disqualifying Jimenez from receiving a license for JA Industries under 18 U.S.C. § 923(d)(1)(C).

      i.    *Jimenez's false statements and omissions about the Jennings family's involvement in Jimenez Arms disqualify him from receiving an FFL.*

Under the GCA, any material false statement in connection with a past or present license application disqualifies the applicant. 18 U.S.C. § 923(d)(1)(D) (disqualifying an applicant who has "made any false statement as to any material fact, in connection with his application"); *id.* § 923(d)(1)(C) (further disqualifying an applicant who has "willfully violated any of the provisions of [Chapter 44]"); *id.* § 924(a) (provision of Chapter 44 prohibiting a "false statement or representation . . . in applying for a[] license").

When Jimenez first applied for an FFL for Jimenez Arms, ATF inquired into Jimenez's continuing connections with the Jennings family. ATF asked Jimenez directly: "Will Bruce

Jennings or any other member of the Jennings family have any role in the company or the licensing premises?" to which Jimenez answered "No." (Pls.' 56.1 ¶ 31.) Jimenez also stated that Jimenez Arms would not have any paid consultants (*id.*), and certified on his applications that he was the sole responsible person for Jimenez Arms (*id.* ¶¶ 40–41). When Jimenez incorporated his business and applied for a new FFL, ATF required Jimenez to sign a statement "under penalty of perjury" that he was "the sole shareholder for Jimenez Arms Inc.," given the agency's ongoing concerns about the Jennings family's influence. (*Id.* ¶ 42.) In every subsequent renewal of Jimenez Arms' license, Jimenez certified that he was the only responsible person for the company. (*Id.* ¶ 49.)

The record contains ample evidence that Jimenez's statements and certifications that the Jennings family would not have "any role" in Jimenez Arms were false. Bruce Jennings—a prohibited individual—brazenly attended ATF's June 2004 inspection interview with Jimenez and threatened to sue ATF and its agents and inspectors if they delayed the process of issuing a license to Jimenez Arms, stating that "ATF was costing him $1,000 a day in expenses for Bryco." (*Id.* ¶¶ 33–34.) As ATF was also aware, Janice Jennings was the sole distributor of Jimenez Arms' products. (*Id.* ¶ 53.) In 2008, trusts in the names of the Jennings children took ownership of two-thirds of the company. (*Id.* ¶¶ 50–52.) And in 2015, Kimberley Jennings contacted ATF to be added as a responsible person to Jimenez Arms' license. (*Id.* ¶ 56.) Jimenez's material false statements and willful failures to disclose material information—in this case, the identity of persons with the direct or indirect power to control his business—permanently disqualify him from receiving a license. *See Gossard*, 206 F. Supp. 3d at 1064–65; *MEW Sporting Goods, LLC v. Johansen*, 992 F. Supp. 2d 665, 680 (N.D. W. Va. 2014), *aff'd*, 594 F. App'x 143 (4th Cir. 2015). ATF's issuance of an FFL to Jimenez for JA Industries therefore violated the GCA and was

contrary to law.

<ii.>        *Jimenez violated the GCA in Jimenez Arms' sales to James Samuels.*

The GCA prohibits a federal licensee from: (i) shipping a firearm in interstate commerce to a person who does not possess an FFL, 18 U.S.C. § 922(a)(2); (ii) selling or delivering a handgun to a person who the licensee knows or has reasonable cause to believe does not reside in the same state as the licensee, *id.* § 922(b)(3); and (iii) transferring a firearm to an unlicensed person before completing a background check, *id.* § 922(t)(1). Jimenez Arms willfully violated each of these provisions in its dealings with Samuels.[6]

According to an affidavit filed by an ATF agent in connection with Samuels' trafficking prosecution, Jimenez Arms shipped firearms from its premises in Nevada directly to Samuels' home in Missouri. These shipments violated 18 U.S.C. §§ 922(a)(2), 922(b)(3), and 922(t)(1). Furthermore, the GCA prohibits unlicensed individuals from engaging in the business of dealing firearms, 18 U.S.C. § 922(a)(1)(A), an offense of which Samuels was convicted. By facilitating Samuels' unlicensed dealing, Jimenez Arms aided and abetted Samuels' offense, in violation of 18 U.S.C. § 2, yet another disqualifying violation by Jimenez. *See Armament Servs. Int'l v. Att'y Gen.*, No. 18-01125, 760 F. App'x. 114, 119 (3d Cir. Jan. 22, 2019) (finding that an FFL applicant was disqualified from receiving a license for aiding and abetting a GCA violation).

That Jimenez Arms' violations were "willful" is demonstrated by the circumstances of

---

[6] Although the record ATF filed in this matter contains no evidence that ATF considered Jimenez's role in Samuels' trafficking operation—which is itself an independent basis for setting aside ATF's licensing decision, as discussed in section II(B)(ii), *infra*—ATF's decision to grant JA Industries' license application was nonetheless contrary to law on the basis of information incontestably in ATF's possession at the time it made its decision. *See NextWave*, 537 U.S. at 300 ("The Administrative Procedure Act requires federal courts to set aside federal agency action that is not in accordance with law . . . ." (internal quotation marks omitted)). Indeed, it was an ATF investigation that uncovered Jimenez's involvement in Samuels' illegal activity, as detailed in an affidavit submitted by an ATF agent in the Samuels prosecution in October 2018, more than a year before ATF granted Jimenez a license for JA Industries. (*See generally* Pls.' 56.1 ¶¶ 63–74.)

those transactions, which at a minimum demonstrated extreme indifference to the GCA. To begin with, in 2011, ATF directed Jimenez Arms to contact an ATF field office if someone in the Kansas City area placed an order with the company to buy guns, putting Jimenez Arms on specific notice that a trafficker in that area may try to buy guns directly from the company. (Pls.' 56.1 ¶¶ 60–62.) In 2013, Samuels told Jimenez Arms that "he purchased Jimenez pistols at a gun show and *wished to purchase directly thru the company*" (*id.* ¶ 63 (emphasis added))—which is illegal without a license. In 2014, Samuels had Jimenez Arms start shipping guns to his home address (*id.* ¶ 67)— a blatant violation of 18 U.S.C. § 922(a)(2). And in 2015, a gun store employee told Jimenez Arms that Samuels "already had buyers for the firearms"—which should have signaled to Jimenez that Samuels was dealing firearms without a license—but Jimenez Arms shipped the guns anyway. (*Id.* ¶¶ 70–71.)

Because Jimenez Arms willfully violated the GCA in its dealings with Samuels, ATF was required to deny Jimenez a license.

## II. ATF's issuance of a license to JA Industries was arbitrary and capricious.

### A. ATF is required to diligently investigate whether an applicant is qualified.

ATF regulations implement the GCA's licensing criteria by requiring the agency, before issuing an FFL, to "find through further inquiry or investigation, or otherwise, that the applicant is qualified." 27 C.F.R. § 478.47(a). Emphasizing diligence and caution, these regulations empower ATF to deny an application "[w]henever [it] has reason to believe that an applicant is not qualified to receive a license." 27 C.F.R. § 478.71. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

**B.    ATF failed to adequately investigate JA Industries.**

ATF failed to adequately investigate JA Industries in at least three ways.  *First*, ATF failed to verify that its concerns about Jimenez raised during earlier licensing investigations had been resolved.  *Second*, ATF failed to consider Jimenez Arms' involvement in James Samuels' criminal activity—even though ATF had led the investigation that uncovered it.  *Third*, ATF failed to follow its own internal procedures before licensing JA Industries.

      i.    *ATF ignored its own materials detailing concerns about granting Jimenez a license.*

During the licensing process for JA Industries in 2020, ATF officials reviewed only a partial record of materials concerning Jimenez's past license applications.  Even this incomplete record contained numerous references to ATF officials' serious reservations about Jimenez— including express statements that Jimenez's past applications should be denied.  Despite these red flags, the ATF officials evaluating Jimenez's 2020 application for JA Industries granted Jimenez a license without investigating the bases for agents' prior concerns or making any effort to determine whether any of those concerns had been satisfactorily resolved.

As the record shows, in February 2005, the ATF area supervisor responsible for Jimenez's application wrote in a high-priority email that he and others "have some concerns" about Jimenez that he would like to investigate in the event Jimenez filed another FFL application.  (Pls.' 56.1 ¶ 36.)  When Jimenez did so (in order to relocate to Nevada from California), ATF officials continued to express concern.  In November 2005, the Director of Industry Operations for ATF's Los Angeles Field Division responded to an email inquiry about whether ATF was "OK with" approving Jimenez's application with an emphatic "NO!"  (*Id.* ¶¶ 42–43.)  An ATF counsel then responded that ATF has "plenty of reason to hold and eventually deny the license."  (*Id.* ¶ 44.)

Surrounding emails suggest that at least some of ATF's concerns were related to

investigators' beliefs that Jennings was illegally controlling Jimenez Arms and Jimenez was lying to conceal Jennings' role. (*See id.*) Had the officials evaluating Jimenez's 2020 application followed up on these references *even just by looking at ATF's own records*, they would have found a wealth of evidence—including evidence that had not been available to the agents evaluating Jimenez's earlier applications—that Jimenez had lied to the agency about Jennings' involvement.[7] For example, in August 2004, as part of a criminal investigation into Bryco for suspected hidden ownership by Jennings, ATF investigators concluded that "[i]t is also believed that Paul Jimenez is working for Bruce Jennings."[8] (*Id.* ¶ 23.) And filings in a 2008 lawsuit between Jennings and ATF—submitted around the same time ATF learned that the Jennings children's trusts had taken a majority stake in Jimenez's business (*id.* ¶¶ 50–52)—reveal that Jimenez Arms hired Jennings as a purported "independent consultant," prompting ATF to warn Jimenez in a letter that he faced potential prosecution over Jennings' involvement in Jimenez Arms.[9] (*Id.* ¶ 55.) The investigators responsible for Jimenez's 2020 application considered *none* of these records. If they had, they would have concluded that Jimenez's repeated affirmations that he was the sole responsible person

---

[7] In the declaration submitted with the record in this case, the agent who conducted the JA Industries licensing investigation states that he "did not identify any other persons—including Mr. Jennings—who had ownership interests in the company or were involved with the company's firearms operations" either during a compliance inspection of Jimenez Arms in 2012 or during the 2020 licensing investigation of JA Industries at issue here. (Pls.' 56.1 ¶ 105.) No materials corroborating this bare assertion appear in the record; to the contrary, the record establishes that ATF was aware well before 2012 that trusts in the names of Jennings' children owned two-thirds of Jimenez Arms. (*Id.* ¶¶ 50–52.) In any case, whether Jennings was still involved in Jimenez's business in 2012 or 2020 is irrelevant to Plaintiffs' challenge. As explained in section I(B)(i), *supra*, substantial evidence in ATF's possession demonstrates that Jimenez lied to ATF *in 2004* when he claimed that Jennings would not be involved in his company's operations. Since there is "no statute of limitations" on "the time period within which [ATF] may consider violations of the [GCA] in its review of an application for a federal firearms license," *Sturdy*, 2011 WL 4407444, at *6, that lie—which ATF inexplicably declined to investigate during the licensing process here—should have disqualified Jimenez from receiving another license in 2020.

[8] ATF made this conclusion just one month after granting Jimenez Arms its first license.

[9] Moreover, in other public court documents easily accessible to ATF, Jimenez represented that: (1) he was lent money to start and run Jimenez Arms both by entities controlled by the Jennings family and by Jennings directly and (2) he paid $1 million for the assets of a Florida company owned by Bruce Jennings' wife, JoAnne Jennings. (Pls.' 56.1 ¶¶ 57, 59.)

for Jimenez Arms, and that no members of the Jennings family had "any role," were lies.

Moreover, ATF's past hesitations about Jimenez appear to have extended beyond its inability to verify Jennings' role in Jimenez's business. (*See, e.g.*, *id.* ¶ 48 ("[W]e have *a number of issues* regarding the application . . . ." (emphasis added)).) Indeed, the licensing record references additional issues that would preclude granting Jimenez's application, but those references lack sufficient detail to determine what the underlying deficiencies were. (*See id.* (summarizing a multi-year history of instructions not to grant Jimenez a license, including "as far as I know LA [Field Office] has not recommended . . . issuance and would like a hold on the license" and "[p]lease do not issue an amended license to Jimenez").) Despite these many indications that Jimenez's qualification to hold a license had been seriously questioned in the past, further communications regarding these concerns—including any explanation of ATF's "plenty of reasons" to "hold and . . . deny" Jimenez's 2005 application (*id.* ¶ 44)—are not in the record ATF considered in evaluating Jimenez's 2020 license application. Nor does the record contain any evidence that those reservations were ever investigated, much less resolved.

That Jimenez Arms ultimately received a license in 2006 does not mean that Jimenez satisfactorily dispelled investigators' concerns. To the contrary, the record indicates that Jimenez had put ATF under extreme pressure to grant his license, and suggests ATF issued that license without resolving its well-founded concerns. Internal ATF communications show that, by March 2005, approximately one month after submitting his change-of-address application, Jimenez was "call[ing] every day" concerning its status. (*Id.* ¶ 37.) Around the same time, Jimenez's attorney wrote a letter implicitly threatening ATF with a discrimination lawsuit if it did not grant Jimenez's application expediently (*id.* ¶ 47), a pattern that continued throughout the summer of 2005 (*id.* ¶ 48). But despite signs that the 2006 license was issued under pressure, the investigators

responsible for Jimenez's 2020 application made no investigation into either ATF's clear reservations about Jimenez's fitness to receive a license or the reasons ATF ultimately chose to overlook them.

In sum, the record before ATF in 2020 indicated that prior inspections raised concerns about Jimenez's fitness to hold a license and provided no basis to believe those concerns had been alleviated. To the contrary, an adequate search of ATF's records would have revealed more signs that Jimenez lied to ATF in prior applications. In declining to consider any materials detailing the concerns that almost cost Jimenez a license even before he had amassed a history of recordkeeping violations—including by failing to consult the agency's own evidence that Jimenez lied to ATF about Jennings' involvement in Jimenez Arms—ATF investigators plainly "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

> ii. *ATF failed to consider Jimenez Arms' facilitation of criminal activity, despite its clear relevance.*

ATF not only failed to investigate preexisting concerns raised about Jimenez's prior license; it also gave *no consideration whatsoever* to Jimenez's facilitation of James Samuels' gun trafficking operation. Indeed, the agent responsible for the licensing investigation has since admitted that he was not even *aware* of Jimenez's sales to Samuels until this litigation was already pending. (Pls.' 56.1 ¶ 78.) ATF's failure to assess Jimenez's role in Samuels' crimes is a glaring procedural oversight. After all, Samuels' prosecution was the result of an investigation *conducted by ATF*, one involving substantial inquiry into Samuels' dealings with Jimenez Arms and at least one interview of Jimenez's employees. (*See, e.g.*, *id.* ¶¶ 63–74.)

That none of the materials from that investigation appear in the record is both shocking and material to the licensing decision. In approving the license, ATF apparently took Jimenez at his word that "the company does not sell firearms to non-licensees," and "the applicant will not sell

firearms to non-licensees." (*Id.* ¶ 99.) But as ATF now concedes, investigators did not even *consider* the agency's own evidence that Jimenez had already done exactly that. Regardless of whether Jimenez's participation in Samuels' criminal activity was sufficient to deny him a license under 18 U.S.C. § 923(d)(1)(C)—and it was, *see supra* section I(B)(ii)—the fact that the 2020 licensing record does not contain a single reference to Samuels is itself a sufficient basis to set aside ATF's decision. Once again, ATF's deficient investigation "fail[ed] to consider an important aspect of the problem," and was therefore arbitrary and capricious. *State Farm*, 463 U.S. at 43.

        iii.    *ATF ignored agency procedures in reviewing JA Industries' application.*



      This departure from the procedures ATF has deemed necessary to ensure applicants are qualified only further indicates that ATF's decision to license JA Industries was arbitrary and

---

[10] Indeed, Jimenez's history of repeated recordkeeping violations is precisely the type of conduct that justifies revocation or nonrenewal under the GCA. *See Am. Arms Int'l v. Herbert*, 563 F.3d 78, 87 (4th Cir. 2009) (affirming judgment upholding ATF's revocation of a license where the licensee "ha[d] shown a profound indifference to ATF's numerous efforts to bring him into compliance"); *Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 348 F. Supp. 2d 1299, 1311–12 (S.D. Ala. 2004) (upholding denial of license renewal application where licensee "did not bring its recordkeeping practices into compliance with the law" even "after receiving a warning letter and a stern lecture from ATF officials").

capricious. *See Nat. Res. Def. Council, Inc. v. EPA*, 438 F. Supp. 3d 220, 231–33 (S.D.N.Y. 2020) (invalidating EPA directive as arbitrary and capricious where it contradicted the policy set forth in an EPA handbook with no reasoned explanation); *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1281–82 (S.D. Ala. 1998) (remanding permit issuance to Fish and Wildlife Service for reconsideration where "[t]he Court can find no evidence that the FWS paid any attention to its own guidelines"); *see also Town of Barnstable v. FAA*, 659 F.3d 28, 34 (D.C. Cir. 2011) (vacating FAA determination as arbitrary and capricious where agency guidance mandated deeper analysis than the agency performed and, "in light of the FAA's improper application of its own handbook, the FAA did not 'adequately explain its result'").

## CONCLUSION

For years, Paul Jimenez flouted federal gun laws. In the past, ATF has been unable to hold him accountable for the harm his unlawful business practices were causing Plaintiffs and countless others. When Jimenez applied for an FFL to operate JA Industries in 2020, ATF had a clear opportunity and legal duty to stop Jimenez's pattern of lawbreaking: ATF already possessed records of Jimenez's past wrongdoings and was legally required to conduct a full investigation of his application for a new license. The GCA, its regulations, and ATF's own procedures required ATF to deny JA Industries a license based on the overwhelming evidence that Jimenez was not qualified to receive one. Because it failed to adequately investigate JA Industries, ATF's decision was also arbitrary, capricious, and contrary to law. Plaintiffs, each of whom have been harmed and will continue to be harmed by ATF's decision, respectfully request that the Court grant summary judgment in favor of Plaintiffs and set aside ATF's decision.

August 13, 2021

CRAVATH, SWAINE & MOORE LLP,

by

<u>/s/ Benjamin Gruenstein</u>
Benjamin Gruenstein
Sharonmoyee Goswami
Samantha Hall
Joseph H. Margolies

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
bgruenstein@cravath.com
sgoswami@cravath.com
shall@cravath.com
jmargolies@cravath.com

EVERYTOWN LAW

Alla Lefkowitz

P.O. Box #14780
Washington, D.C. 20044
(202) 545-3257 ext. 1007
alefkowitz@everytown.org

Molly Thomas-Jensen
Aaron Esty
Ryan Gerber

450 Lexington Ave.
P.O. Box #4184
New York, NY 10017
(646) 324-8365
mthomasjensen@everytown.org
aesty@everytown.org
rgerber@everytown.org

*Attorneys for Plaintiffs Kansas City, Missouri
and Everytown for Gun Safety Support Fund*

KWAME RAOUL
Attorney General of Illinois

by

_Kathryn Hunt Muse_
Kathryn Hunt Muse
Office of the Attorney General

100 West Randolph Street
Chicago, IL 60601
(312) 814-3000
Kathryn.Muse@ilag.gov

*Attorney for Plaintiff State of Illinois*